Delores **NORWOOD** et al., Plaintiffs,

v.

**D. L. HARRISON** et al., Defendants.

No. WC 70–53–K.

United States District Court, N. D. Mississippi, W. D.

July 12, 1974.

923

Melvyn R. Leventhal, Jackson, Miss., for plaintiffs.

William A. Allain, First Asst. Atty. Gen., Jackson, Miss., West Tallahatchie Academy, Andrew C. Baker, Charleston, Miss., County Day School, Andrew C. Baker, Charleston, Miss., French Camp Academy, W. T. Denman, III, Eupora, Miss., Christ Episcopal Day School, George Morse, Gulfport, Miss., Presbyterian Day School, L. Ellis Griffith, Cleveland, Miss., for defendants.

MEMORANDUM OPINION

KEADY, Chief Judge.

Pursuant to the Supreme Court's decision in Norwood v. Harrison, 413 U.S. 455, 93 S.Ct. 2804, 37 L.Ed.2d 723

(1973), wherein the prior decision of this court [1] was vacated and the cause remanded for further proceeding to establish a certification procedure, subject to judicial review, to determine the eligibility vel non of private schools in Mississippi to receive and use state-owned textbooks, the three-judge district court originally constituted in this cause was dissolved by order dated July 9, 1973.

Thereafter, by subsequent order dated July 25, 1973, the district court, through the managing judge, permanently enjoined defendants from making available state-owned textbooks "to any private school in Mississippi which engages in discrimination of any kind or character based on race, creed, color, or national origin." The court ordered the establishment of a certification procedure approving a "Certification and Background Information" form which defendants were directed to require each private school to complete and file with the State Textbook Purchasing Board (Board). As a concomitant part of the certification procedure, the Board was directed to promptly determine the eligibility of private schools applying for state-owned textbooks during the 1973–74 school year. Additionally, consistent with the decision of the Supreme Court in *Norwood*, the July 25 order provided for judicial review by which a party aggrieved by the Board's final administrative decision might bring the issue of a school's eligibility for an adversary hearing before this federal district court.

Upon the completion of the state certification procedure, the Board approved 24 schools to which plaintiffs initially filed objections. Of that number, only 7

schools now remain before the court for determination of their state-owned textbook eligibility.[2]

Evidentiary hearings have been conducted for each of the private schools at issue, and the court is obliged to make a school-by-school determination of whether they must be found to be racially discriminatory and not entitled to textbook assistance or whether they qualify for such aid under *Norwood's* rationale.

■ The ultimate issue for resolution is, of course, whether a particular private school has a racially discriminatory admissions policy, bearing in mind that *Norwood* refused to imply "a finding that all private schools alleged to be receiving textbooks aid are in fact practicing restrictive admission policies." 413 U.S. at 471, 93 S.Ct. at 2813, 37 L.Ed.2d at 734–735. In these proceedings on remand, we are surely not called upon to issue a "blanket condemnation" of all private schools requesting textbook aid. Implicit in this approach is a requirement that plaintiffs bear the burden of establishing at least a prima facie case against each challenged school, in which event the whole evidence must be evaluated to reach correct determinations.

■ The quantum of proof required to make out a prima facie case, which is of critical importance, is to be considered within the context of each case. However, for those private academies serving elementary and secondary grades, or both, which were established during the wake of massive desegregation orders of federal courts, we believe that a prima facie case of racial discrimination arises from proof (a) that the school's existence began close upon the heels of the massive desegregation of

1. This decision was rendered by a three-judge district court at 340 F.Supp. 1003 (N.D.Miss.1972).

2. Of the original 24 schools to which plaintiffs objected, 4 have voluntarily withdrawn their requests for textbook aid and surrendered textbooks in their possession; 13 schools have entered into agreed stipulations

with plaintiffs, which resulted in the dismissal of their appeals. The remaining 7 schools still in contest are: Sylva Bay Academy, West Tallahatchie Academy, South Haven Mennonite School, County Day School, French Camp Academy, Christ Episcopal Day School, and Presbyterian Day School of Cleveland.

public schools within its locale, and (b) that no blacks are or have been in attendance as students and none is or has ever been employed as teacher or administrator at the private school. We do not, of course, intimate that plaintiffs' initial burden cannot be carried by additional buttressing proof for those schools not established to provide a segregated alternative to public school desegregation. But, the critical time of a private school's formation or unusual enlargement must be a significant factor, though one not necessarily decisive, in determining whether it is racially discriminatory. Graham and United States v. Evangeline Parish School Board, 5 Cir., 484 F.2d 649, rehearing en banc denied 485 F.2d 687; McNeal v. Tate County Board of Education, 460 F.2d 568 (5 Cir. 1971); Gilmore v. City of Montgomery, 473 F.2d 832 (5 Cir. 1973), cert. granted 414 U.S. 907, 94 S. Ct. 215, 38 L.Ed.2d 145 (1973). We judicially know from the records and files of the federal district courts of Mississippi that prior to the Supreme Court's holding in Green v. County School Board, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), which rejected "freedom-of-choice" as a workable means of desegregating public schools, few blacks were enrolled in the former "white" schools of the state, and also few nonpublic grade schools existed in Mississippi.[3] Between the time interval (one school year) of *Green*, which was decided May 27, 1968, and Alexander v. Holmes County Board of Education, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19, decided October 29, 1969, ordering mid-year massive desegregation

for a number of Mississippi school districts, the growth of nonpublic schools throughout the state was unprecedented, a phenomenon noted in *Norwood*.[4] Newly formed schools designed to serve students withdrawing from the desegregated public schools may be legitimately considered as a factor in presuming that such schools had a racially restrictive admission policy.

■ The second factor needed to support the inference, i. e., the total absence of blacks as students, teachers or administrators, is but an application of the familiar principle that courts are required to pay heed to statistics which convey a message of putative discrimination. United States v. Jacksonville Terminal Co., 451 F.2d 418 (5 Cir. 1971), cert. denied 406 U.S. 906, 92 S.Ct. 1607, 31 L. Ed.2d 815 (1972); Hawkins v. Town of Shaw, 437 F.2d 1286 (5 Cir. 1971), aff'd en banc 461 F.2d 1171 (1972); Wade v. Mississippi Cooperative Extension Service, 372 F.Supp. 126 (N.D.Miss.1974).

■ Once plaintiffs have established a prima facie case of racially discriminatory admission policies as to a particular academy, the burden shifts to the school's officials or representatives to rebut an inference of racial disparity. That this is the proper evidentiary approach in discrimination cases is firmly established, as exemplified by Circuit Judge Tuttle in Hodgson v. First Federal Savings and Loan Ass'n, 455 F.2d 818, 822 (5 Cir. 1972):

"In discrimination cases the law with respect to burden of proof is well-settled. The plaintiff is required

3. The private-school development during the "freedom-of-choice" era in the state's public schools is documented in Coffey v. State Educational Finance Commission, 296 F.Supp. 1389, 1393 (3-judge court, S.D.Miss.1969).

4. Chief Justice Burger, in *Norwood*, at 413 U.S. 457, at 93 S.Ct. 2806, at 37 L.Ed.2d 727, wrote:

"Private schools in Mississippi have experienced a marked growth in recent years. As recently as the 1963-64 school year, there were only 17 private schools other than Catholic schools; the total enrollment was 2,362 students. 916 students in these

nonpublic schools were Negro, and 192 of them were enrolled in special schools for retarded, orphaned, or abandoned children. By September of 1970, the number of private non-Catholic schools had increased to 155 with a student population estimated at 42,000, virtually all white. Appellees do not challenge the statement, which is fully documented in appellants' brief, that 'the creation and enlargement of these [private] academies occurred simultaneously with major events in the desegregation of public schools . . . .'"

only to make out a prima facie case of unlawful discrimination at which point the burden shifts to the defendants to justify the existence of any disparities."

The question next arising goes to the sufficiency and strength of rebuttal evidence offered by a school; if none is offered, an inference of discrimination becomes unassailable. At this point, it is important to emphasize that the ultimate issue in administering Mississippi's textbook program to private schools is not whether black students are actually enrolled at the school, but whether their absence is because the school has restrictively denied their access; simply, does the school have a racially discriminatory admissions policy? Thus, concerning plaintiffs' proof that no blacks presently attend or have ever attended a particular school formed as an alternative to desegregated public schools in the community, rebuttal evidence may not be limited to mere denials of a purpose to discriminate; rather, to be effective, the evidence must clearly and convincingly reveal objective acts and declarations establishing that the absence of blacks was not proximately caused by such school's policies and practices. Once the inference is repelled, plaintiffs would be obliged to offer evidence of specific discrimination. School officials may, therefore, overcome a prima facie case against their school by proof of affirmative steps instituted by the school to insure the availability of all of its programs to blacks who may choose to participate. Illustrative steps of this type would certainly include proof of active and vigorous recruitment programs to secure black students or teachers, including student grants-in-aid, proof of continued, meaningful public advertisements stressing the school's open admissions policy, proof of communication to black groups and black leaders within the community of the school's nondiscriminatory practices, and similar evidence calculated to convince one that the doors of the private school are indeed open to students of both the black and white races upon the same standards of admission.

With the foregoing legal principles in mind, we have determined the facts as shown by largely undisputed evidence as it relates to each private school in issue. The end result is that we find under *Norwood's* mandate that four schools are ineligible to receive state-owned textbooks, while two schools clearly qualify and one school is conditionally approved and placed on a one-year probationary period before final determination.

### 1. *Sylva Bay Academy.*

■ This nonsectarian school, which lists its present address at Bay Springs in Jasper County, Mississippi, was established August 25, 1972, and serves grades 1–12. According to its certification form (Ex. 1), its student body and faculty during the two years of its existence have been all-white.[5] The evidence indicates that desegregation plans instituted in the Smith County and West

---

5. Plaintiffs represent that this school is the successor to Sylvarena Academy, formerly located at Sylvarena in Smith County. If this representation is correct (and the Academy did not appear or offer evidence), Chief Judge Dan M. Russell, Jr., of the United States District Court for the Southern District of Mississippi, in an unreported opinion dated May 1, 1972, cancelled the school building lease made by Smith County School Board to the Sylvarena Academy on the ground that the building was impermissibly sought to be used as a private, segregated school serving all white students. On appeal, the Fifth Circuit upheld the lease but enjoined that the use of the leased building had to be on a nondiscriminatory basis, open to all students. United States v. Miss., D. C., 476 F.2d 941 (1973), rehearing en banc granted Sept. 20, 1973 (awaiting decision). Counsel for plaintiffs further advise that during the pendency of the appeal, Sylvarena Academy vacated the leased premises and moved to its present site in Jasper County.

Jasper County school district for the public schools in that area required massive desegregation no later than September 1970. This resulted in an almost immediate reduction of 350 white students formerly enrolled in the public schools serving the locality. These facts, unexplained, support an inference that Sylva Bay Academy adheres to a racially discriminatory admissions policy. This deduction is actually supported by other information facially appearing on the Academy's textbook application, such as its admissions that the school has never been recognized as an entity exempt from federal income taxes nor has it ever adopted a written affirmative policy of admitting students irrespective of race. Since no evidence whatever was offered to rebut the prima facie case clearly made by plaintiffs, Sylva Bay Academy is held to be disqualified from participating in the state's textbook program.

### 2. *West Tallahatchie Academy.*

█ This school is located at Tutwiler in Tallahatchie County. It was first opened in September 1970, originally serving grades 1–8; the 9th grade was added in 1973. According to its certification form (Ex. 2), the school's student body and faculty during the five semesters of its existence have been all-white. This non-sectarian school, which drew its students from the immediate vicinity, was created on the heels of an order of this court entered July 9, 1970 (U.S. v. Miss., No. WC 70–53–K, N.D.Miss.) which required the public schools of the West Tallahatchie School District to commence operating immediately on the basis of geographic zones. All of the Academy's student body and most of its faculty shifted from the public schools following desegregation. There was a noticeable decline (10%) in the enrollment of white students in Tallahatchie County public schools. Thus an inference of racial discrimination arises with respect to this Academy, which failed to present substantial, convincing

evidence that it does, in fact, espouse and practice an open admissions policy. The Academy concedes that it has never been recognized by internal revenue officials as entitled to income tax exemption but nevertheless asserts that on one occasion it did adopt a written affirmative policy to admit students irrespective of race. The only evidence of this is a school board statement made September 6, 1973, or nearly one month after it submitted the requisite application to the Board for state-owned textbooks for the 1973–74 school year. Moreover, the adoption of this policy was not publicized at all in the local community, or otherwise brought to the attention of black citizens prior to February 21, 1974. On that day, which was *one week* before our evidentiary hearing, the Academy ran an advertisement in the local newspaper. The Academy presented no credible evidence of communication or contact with the black community in the Tutwiler area to disclose an intention to accept black students on the same terms as white students. This Academy having failed to effectively rebut an inference of racial discrimination, we are compelled to hold that it is disqualified from receiving state-owned textbooks. Indeed, to hold otherwise on this record would be, we think, an abuse of discretion.

### 3. *South Haven Mennonite School.*

█ This small school is situated at Prairie Point in Noxubee County, 7 miles east of Macon. As shown by its certification form (Ex. 3), it was established in September 1971 for grades 1–8, with 48 students and 3 teachers; last year's enrollment was 85 and the faculty has increased to 4. All students and teachers have been of the white race, except for one student of Mexican ancestry. The school is operated by the local congregation of the Church of God in Christ, Mennonite; and all teachers in the school are required to be members of that faith, though they need not be college graduates nor required to meet state certification standards. Mennon-

ites first settled in this area of Noxubee County in 1967, having emigrated from various states in the Union. The school enrollment, however, is not limited to Mennonite children; as many as one-third who attend are not of that religious persuasion. When the school commenced operations, the students enrolled, other than new arrivals from different sections of the country outside Mississippi, had the previous year (1970–71) attended either the public schools, or the Magnolia Mennonite School, or Central Academy, all at Macon. Prior to the 1970–71 school year, all Mennonite children in the Macon area attended the local public schools; in that year all whites withdrew from the entire public school system following the desegregation order for the Noxubee County School District.[6] The school officials frankly conceded that the South Haven Mennonite School was organized because the Magnolia School was unable to take care of all students who took part in the white boycott of the desegregated public school system at Macon and also because the parents of other students were financially unable to pay higher tuition rates charged by the segregated Central Academy.

The South Haven Mennonite School made no appearance in court and, of course, offered no evidence. Leo Classen, the school board's chairman, was deposed by plaintiffs' counsel after the scheduled date for hearing. This official testified that the school actually preferred not to use state textbooks because of certain subject matter appearing therein, and, in fact, they had established their book curriculum for the first three grades. A distinctive feature of the curriculum is 30-minute daily Bible study. Classen conceded that, while

Mennonites were, in principle, opposed to any sort of discrimination, including racial discrimination, and the school had adopted a written affirmative policy,[7] no effort had been made by the school officials or the church congregation to advise the local black community that an open admissions policy existed or to let blacks know that their children might enroll in the school on the same terms as white students.

Admittedly the factors for a prima facie case are here present. The only question is whether this school, sponsored by a close-knit Christian membership, has successfully rebutted the inference of a racially discriminatory admissions policy. The school's reluctance, if not disdain, in presenting evidence to this court has not facilitated our task. Nevertheless, this court has undertaken to give this school utmost, careful consideration in view of its status as a church-sponsored school emphasizing religion. Despite contrary claims, however, we are driven to the conclusion that the South Haven school exists as a haven for perpetuating white, segregated education.

### 4. *County Day School.*

■■ This private, nonsectarian school, located at Marks is operated by the Quitman County Educational Foundation. The group obtained a charter November 10, 1964, and by using a building provided rent-free by the Marks Presbyterian Church, opened school for the first time in September 1965, which was coincident with "freedom-of-choice" implementation for grades 1–4 in the public schools of Quitman County. The County Day School's dramatic increase in an all-white student enrollment and in an enlarged all-white

---

6. This school district was included in the several school districts subject to the orders (United States v. Noxubee County School District) of the U. S. District Court of the Southern District of Mississippi in cases consolidated on appeal to the Fifth Circuit in Adams v. Matthews, 403 F.2d 181 (1968).

7. "The South Haven Mennonite School is a private, christian school which has been and will continue to be operated under policies which are racially nondiscriminatory in all matters, including its admissions policy, administration, standards of conduct, scholarship programs, loan programs, athletic programs and extra-curricular programs."

faculty (see certification form, Ex. 4), is directly attributable to the pace of desegregation in the county's public schools as shown below.[8] The records and files show heavy withdrawal of white students from the public schools of Quitman County during this period of transition. From its inception, the recruitment efforts of County Day School have been directed at white students only. The respondent school attempts to rebut the prima facie case against it by urging that it does enjoy federal income tax exemption and has adopted a written affirmative policy of admitting students regardless of race, a policy which they emphasize has been published in the Marks newspaper. The evidence does indeed indicate that after conferring with internal revenue officials the school board, by a split vote, took such a position. This position was in September 1971 restated in an effort to comply with the requirements of the internal revenue officials acting under the orders of the U. S. District Court for the District of Columbia in Green v. Connally, 330 F.Supp. 1150 (3-judge 1971).[9] No further statement of an open admissions policy, however, was made or published by County Day School for more than two years. On January 31, 1974, less than one month before the evidentiary hearing in this court, the Foundation placed an advertisement in the local newspaper. The school made no showing of meaningful contacts with the black community at Marks or that it made recruitment efforts for black students. Recognition by Internal Revenue Service that a school is entitled to tax exempt status and its donors may have their gifts deducted for income tax purposes is, of course, some indication that a school has an open admissions policy, but it is not alone determinative. In this case, where it appears that an open admissions policy was obviously stated perfunctorily, at isolated intervals, and only to obtain tax advantages, we are unconvinced that the school has a position other than one taken to procure tax benefits but without sacrificing the goal of white, segregated education. We conclude that the absence of substantial, convincing evidence presented by the Quitman County Educational Foundation to offset its history of segregation requires us to hold that it fails to qualify for state textbooks.

8.

| | | Quitman County Educational Foundation | |
| School year | Public School Desegregation Event | Grades Served | Enrollment |
| 1965 | Freedom of Choice grades 1–4 | 1–4 | 22 |
| 1966 | Freedom of Choice grades 1–8 | 1–5 | 41 |
| 1967 | Freedom of Choice grades 1–12 | 1–8 | 97 |
| 1969 | Litigation over terminal plan | 1–12 | 300 |
| 1970 | Terminal Plan Implemented | 1–12 | 490 |

See orders of this court in Franklin v. Quitman County Board of Education, No. DC 67–9–K, N.D.Miss., and also deposition of Dr. Lloyd R. Henderson.

———◆———

9. In *Green*, the Court, in a suit brought by Negro parents of school children attending public schools in Mississippi, granted injunctive relief against U. S. Treasury officials to require them to take affirmative steps against private schools in Mississippi under a "badge of doubt" as to their racially non-discriminatory admissions policy.

### 5. *French Camp Academy.*

 This Academy, sponsored by the Presbyterian Synod of Mississippi, is situated on the Natchez Trace Parkway at French Camp, in the Southwest corner of Choctaw County. As shown by the certification form (Ex. 5), this institution was founded in 1886 as a boarding school serving grades 9–12. In 1951, the Academy was made a "school home" for boys and girls of all ages who were orphaned or unable to remain with their parents because of broken homes or other special problems. The student body, which represents diverse religious denominations, comes from nearly a dozen states and two foreign countries, yet the majority of its students are from different sections of Mississippi. Almost half of the students pay no tuition or costs; the remainder pay varying portions of school cost, but all students perform work chores at the institution. Traditionally, children of elementary age have attended the public schools at French Camp. On August 5, 1970, this court entered a consent order of massive desegregation for the public schools of Choctaw County (U. S. v. State of Miss., No. WC 70–36–K), effective the following month. All elementary students boarding at the Academy continued to attend the public school at French Camp, which, of course, was fully integrated as to students, faculty, staff and activities. The Academy, however, provides on the Academy grounds to black and white students enrolled in the local public elementary school music and athletic training with Academy teachers, coaches and equipment. Moreover, students finishing the local elementary school (one-third of whom are black) are given a reception by the Academy and they are regularly invited to attend the Academy High School, in view of the fact that the nearest public high school is at Weir, 8 miles away. The available information does not reveal any reduction in white enrollment at the French Camp Elementary School and slight change in the enrollment of the public schools at Weir.[10]

Approximately 100 students are enrolled in the Academy's high school, one-fourth coming from Choctaw County. While no blacks have yet been enrolled in regular school sessions, school officials have had contacts with several black applicants. In fact, three blacks were accepted for last year's summer sessions, one attended, but two did not enroll because they were unable to obtain the makeup courses necessary. The Academy's high school teams regularly compete in football, basketball and other sports with nearby desegregated public high school teams. Black speakers have addressed the student body; and one black college student has assisted in the summer program. Otherwise, the faculty is and has been all-white.

The school officials, at trial, emphasized all applicants must show a need for admission and are accepted only after personal interview. Usually, public welfare agencies contact the school with referrals; and welfare workers of both races have visited the campus and understand the school's open admissions policy. The school has long enjoyed a tax exempt status and it has consistently proclaimed that it exists to serve needy children regardless of race.

Plaintiffs criticize the literature and brochures published by the Academy for lack of specific words expressing clear intent to admit needy children, irrespective of their race or color, and they ex-

---

10. Information supplied by the Choctaw County Board of Education shows the following:

| French Camp | Blacks | Whites |
|---|---|---|
| 1970–71 | 69 | 133 |
| 1971–72 | 66 | 120 |
| 1972–73 | 71 | 136 |
| 1973–74 | 68 | 130 |

| Weir | Black | White |
|---|---|---|
| 1970–71 | 175 | 159 |
| 1971–72 | 365 | 325 |
| 1972–73 | 373 | 319 |
| 1973–74 | 364 | 260 |

press disappointment that the efforts to obtain from the Academy greater concessions by stipulation were unsuccessful. Plaintiffs neverthelesss offer no direct evidence of racial discrimination, either espoused or practiced by this private school. Obviously, requisite factors giving rise to an inference of racial discrimination are not here present. Indeed, instead of a paper position, French Camp Academy has, in the eyes of this court, made a convincing case for accepting and schooling needy children across racial lines. As President Angle testified, French Camp compares with the noted Piney Woods School, in South Mississippi, also a work school for needy children which has traditionally served black students, yet it is an institution which no one can successfully challenge as racially discriminatory. French Camp Academy clearly qualifies for state textbooks.

### 6. Christ Episcopal Day School.

■ This school, located at 912 South Beach Street, Bay St. Louis, is sponsored by the Episcopal Church of Bay St. Louis; and Rev. Charles Johnson, the Rector, is its headmaster. The Day School operates as both an elementary and a high school, with a current enrollment of 275. As shown by its certification form (Ex. 6), the school began in 1950 as a kindergarten. One grade a year was added through the 8th grade (1951–59). In 1967 the 9th grade was added, and 10–12 grades in 1969. The student body is, and always has been, white; and all 25 teachers, except for one instructor of the Indian race, are white. The evidence indicates that freedom-of-choice plans, required by HEW but without court order, were first instituted in the Bay St. Louis public schools in 1965–66 (grades 1–3, 12), expanded to all grades in 1966–67, followed by terminal (pairing) desegregation in 1969–70 for grades 8–12, and all twelve grades in 1970–71. The other public schools in Hancock County achieved complete desegregation at about the same pace.

At first blush, basic factors would indicate that a prima facie case of discrimination has been made, at least as to the upper four grades formed in 1967 and 1969. The first 8 grades were, without doubt, operated years before the advent of "freedom-of-choice" desegregation in any form, and they could not, per se, be regarded as a school provided as an alternative to desegregated public education. Moreover, substantial evidence, supportive of this conclusion, is that with the advent of final desegregation of the public schools in Bay St. Louis and throughout Hancock County, there was no reduction in the number of white students attending those schools.[11] Our critical attention must be directed at the formation in 1969 of the three upper high school grades, and what objective reasons, if any, existed for the school's enlargement.[12] The school officials gave a credible and acceptable explanation for this event, i. e., the closing of a local girls' school which had been operated by the Catholic Sisters for more than 100 years and this, in the minds of many persons, presented a need in Bay St. Louis for the continued private schooling of high school students.

11. Data obtained from the deposition of Lloyd R. Henderson, with accompanying exhibits, as supplemented by records from the public school superintendents of Bay St. Louis Separate School District and Hancock County Board of Education reveal the following:

| Bay St. Louis | Black | White |
| --- | --- | --- |
| 1968–69 | 471 | 1673 |
| 1969–70 | 438 | 1489 |
| 1970–71 | 420 | 1635 |

| Hancock County | Black | White |
| --- | --- | --- |
| 1968–69 | 260 | 1362 |
| 1969–70 | 183 | 1723 |
| 1970–71 | 450 | 1307 |

12. The high school grades are known as Coast Episcopal High School, which is advertised as a college preparatory school. The high school with certain lower grades is actually located on a separate campus at Pass Christian, while the first six grades are maintained on the original campus at 912 South Beach Street, Bay St. Louis.

The nearest private Catholic high school was 20 miles away, yet the evidence fairly supports the conclusion that local citizens had long supported private parochial schooling. In fact, when Christ Episcopal began its high school operation, 70% of its enrollment was female; girls currently compose one-half of the 90 students enrolled in the top four grades of the school.

Enjoying tax exempt status since November 15, 1962, Christ Episcopal School trustees, in August 1971, adopted a written declaration restating its policy of admitting students irrespective of race. Granted that this restatement of position was taken as a direct result of Green v. Connally, yet the trustees' resolution did not merely express an open admissions policy as consistent with the school's past operation but directed Rev. Johnson to notify the press, radio, TV and news media in Pearl River, Harrison and Hancock Counties of their reaffirmance and continuance of a nondiscriminatory policy. Rev. Johnson, pursuant to this direction, published explicit news releases in the daily newspapers, radio and TV stations in the Gulf Coast area. Additionally, the resolution was forwarded to black leaders in the Bay St. Louis community; all future advertising and brochures of the Christ Episcopal Day School carried unequivocal notices of a racially nondiscriminatory admissions standard. Newspaper advertisements consistently appeared in the Bay St. Louis, Biloxi and Gulfport newspapers not only in 1971 but through the spring and summer months prior to the September 1972 school opening. In 1973 news bulletins without newspaper publication continued, and the school's current brochure contains an explicit statement of nondiscrimination.[13]

Rev. Johnson testified that while no black student had ever applied for admission, no applicant has ever been turned down because of inability to pay the tuition. The clergyman emphasized that his school is prepared to and will accept black students if they apply and he has no objection to hiring black teachers or inviting black speakers to the campus, and that the school remains open to engage in dialogue with the black community and to accept blacks at all levels of the school. That plaintiffs were unable to wring from this school greater concessions in a stipulation is hardly determinative of the issue. In sum, we conclude that Christ Episcopal Day School has shown credible evidence sufficient to effectively rebut any inference of racial discrimination, and since plaintiffs have offered no direct evidence of discrimination, the school is entitled to continue to receive state-owned textbooks.

### 7. Presbyterian Day School.

■ An entity of the First Presbyterian Church of Cleveland, this nonsectarian school came into being in 1965 as a kindergarten only. During that year the church erected a new sanctuary and Sunday School building situated on Cleveland's west end. The kindergarten in 1968 was expanded to include first and second grades. Additional grades up to the 8th grade were added as follows:

| | |
|---|---|
| 1969 | 3rd and 4th |
| 1970 | 5th |
| 1971 | 6th |
| 1972 | 7th |
| 1973 | 8th |

No present plans exist to add to the 8-grade grammar school which operates directly under a board of trustees sub-

13. "ADMISSION REQUIREMENTS
"The School is open to students of all religious faiths and races. It is the policy of Christ Episcopal Day School and Coast Episcopal High School to admit the students of any race to all the rights, privileges, programs, and activities generally accorded or made available to students at the school, and to make no discrimination on the basis of race in administration of educational policies, applications for admission, scholarship or loan programs, and athletic and extra-curricular programs."

ject to the authority of the Session, governing body of the local church. As shown by its certification form (Ex. 7), the school's 1973 enrollment was 168 white students, and its faculty consisted of 14 white teachers. The headmaster is William Maynor, an ordained Presbyterian minister. No blacks are or have ever been enrolled as students or have served as instructors. The school's upper five grades were added following the implementation of local public school desegregation pursuant to geographic zoning, as ordered by this court on July 22, 1969.[14] Plaintiffs emphasize that these basic factors justify an inference of racial discrimination, which they do in the absence of acceptable explanation. Plaintiffs stress that the evidence shows that it was "white flight" from Cleveland's desegregated public schools during 1968–69 which increased the Day School's student enrollment from 25 to 135 and its teaching staff from 2 to 6, and they underscore the point that most, or all, such students and teachers had been with the public schools the previous school year.

The school officials at trial made vigorous efforts to rebut the inference of a racially discriminatory admissions policy. The proof shows that the Presbyterian Day School, operated as an entity of the local Presbyterian Church, ostensibly adheres to the church's policy of admitting students irrespective of race. (See written affirmative policy attached to Ex. 7). The policy of the Presbyterian Church of the United States (frequently referred to as the Southern Presbyterian Church), to which the local

congregation owes allegiance, strongly advocates racial integration in church practice and procedure.[15] The local church, through its Session, also has adopted a policy of admitting persons to the church and all its functions without regard to race. The present minister, Dr. Wilson Benton, Jr., accepted the call to the church, on an explicit understanding that blacks were welcome to participate in worship services and all other church functions, and to become members of the congregation. With respect to the Day School, the admissions policy grants priority to children whose parents are Presbyterian Church members, next to brothers and sisters of children attending the school, and next to others who apply in chronological order.[16]

The church officials emphasize that while in many respects the school's curriculum parallels that of a public elementary school, a Christian atmosphere and Bible study are distinctively stressed to a degree that the institution should be regarded neither as a public school nor private school but as a "Christian school". Counsel for plaintiffs challenge the credibility of the official explanation that their educational institution is actually open to blacks and assert that goals of white segregated education cannot be cradled, permissibly with state-aid, within a church having adult and other programs of genuine interracial outreach. This challenge is not without force, and causes us concern. For, it is without dispute that the Cleveland Presbyterian Church has adopted unusual, innovative programs designed to reach, and which do effectively reach,

---

14. Cowan v. Bolivar County Board of Education, School District No. 4, No. DC 65–31–K.

15. In recent meeting at Louisville, Kentucky, the General Assembly of the Presbyterian Church of the United States, elected Dr. Lawrence Bottoms, a black clergyman from the Atlanta area, as Moderator for the forthcoming year.

16. Plaintiffs also challenge the legality of this school's right to receive textbooks on

the ground that its admissions policy discriminates on the basis of religion, a point which we summarily reject in view of an affirmative showing that the school is not filled to capacity and no one has yet been excluded on religious grounds. Only one-fourth (44 out of a total enrollment of 168) of the students come from Presbyterian families. The Day School is the only private school (except for kindergartens) in Cleveland, which has a population of more than 13,000.

across racial lines. For example, since 1968 it has regularly conducted an active ministry at the nearby Mississippi State Penitentiary for inmates, both black and white, who have been accepted as affiliate church members; since 1968, it has consistently conducted college student programs for nearby desegregated Delta State University, whereby black and white college students receive, and participate in, the church's ministry both on campus and within the church. Under Dr. Benton's ministry, the church has taken definite leads for sponsoring interracial adult meetings on the church premises and in participating with the efforts of black ministers throughout Cleveland. Without doubt, the minister and the Session are committed to accepting into church membership blacks who may wish to join; and blacks do from time to time attend church services, yet no black has yet sought church membership. The school officials maintain that if a black family does join the church, the children of that family would have top priority for admission to the Day School along with white Presbyterians.

A perplexing factor is that while the Presbyterian Day School, as an entity of the church, enjoys tax exempt status, and apparently has had no involvement with the orders in Green v. Connally, it has failed to publicize in the Cleveland community newspaper, radio or television declarations that the school will accept blacks on the same terms as whites.

Dr. Benton declares in his testimony that the open admissions policy is known among the local black leaders. Another aspect for correct evaluation of this school requires that we consider what has been the effect of white enrollment in the public schools of Cleveland (District No. 4) and nearby Shelby (District No. 3) since the advent of massive desegregation. The reports on file with this court indicate that white enrollment has not declined in the Cleveland public schools but has materially declined at Shelby, 15 miles to the north of Cleveland. These enrollment figures are set out below.[17] The evidence shows that most of the students graduating from the Presbyterian Day School do attend the desegregated Cleveland public high school.[18] The record is not at all clear as to what portion, if any, of the white students withdrawing from the Shelby schools attend Presbyterian Day School. Bayou Academy and other segregated private schools in Bolivar County are within easy reach of Shelby students.

The evidence thus presented by the record poses a troublesome question for the court. We agree with defendants that the local church, as a congregation, is racially nondiscriminatory in policy, practice and dedication, yet we are moved by plaintiffs' observation that, for some reason, positive, let alone original, measures calculated to make the Day School nondiscriminatory in policy and practice, appear to be lacking. Our

17. 

| Cleveland | Black | White | Other |
|---|---|---|---|
| 1969–70 | 2902 | 1796 | 53 |
| 1970–71 | 2953 | 1765 | 52 |
| 1971–72 | 3047 | 1774 | 44 |
| 1972–73 | 2984 | 1694 | 59 |
| 1973–74 | 3072 | 1694 | 52 |
| Shelby | | | |
| 1969–70 | 1635 | 255 | |
| 1970–71 (not available) | | | |
| 1971–72 | 1666 | 55 | |
| 1972–73 | 3390 | 52 | 64 |
| 1973–74 | 3210 | 62 | 51 |

18. Plaintiffs' counsel emphasizes this is a majority white high school, a criticism wholly irrelevant to the issue at hand.

quandary in reaching a just result under *Norwood's* mandate has caused us to hold that the path of justice and equity is to approve this school conditionally, and only for the 1974–75 school term, insofar as its continued use of state textbooks is concerned, and place it on probationary status. In this way, the school will have fair opportunity, if it wishes to continue with state textbooks, to institute meaningful plans and practices to acquaint all blacks within the Cleveland community that it adheres to an open admissions policy, to institute recruitment efforts to obtain blacks in the school as students or teachers, or adopt other measures which will convincingly demonstrate that the school is not racially segregated. It will not do for the respondent school simply to say that since the Presbyterian Church does not proselyte for members, the school also must remain passive in its dealings with the parents of black students at Cleveland; for while restraint may be good and commendable church polity for Presbyterians as a denomination, it hardly satisfies constitutional mandates, if this all-white school is to continue receiving state textbook aid, that it not discriminate on the ground of race. Evidentiary hearings in the spring months of 1975 will afford the court an adequate factual basis for final determination.

## CONCLUSION

The saga of private schools in Mississippi receiving state textbooks prior and subsequent to the Supreme Court's decision in *Norwood* should be briefly recounted. Before *Norwood*, 107 private academies received such aid; after *Norwood*, 33 academies applied for state textbooks in accordance with certifica-

tion procedure established by this court upon remand. Of this number, the Board at the administrative level found 5 ineligible and approved 28. Plaintiffs filed objections to 24 schools approved by the Board. Pending appeal to this federal district court, 13 private academies were able to satisfy, by stipulation, challenges raised by plaintiffs. As previously stated, 4 academies voluntarily withdrew their requests for textbooks after challenge; and we have herein found 4 more academies ineligible, 2 qualified, and one approved only conditionally for one year.

■ We agree with plaintiffs that the Board should not distribute further state-owned textbooks to any private school not presently approved or in the possession of state-owned textbooks without prior approval of this court. All schools not approved for state textbooks no longer have them or are required forthwith to surrender possession. It is just that henceforth judicial review must anticipate, and not follow, the actual shipment of state textbooks to any private school not already approved for such assistance either by this court or by the Board, including those cases where the private school may have voluntarily withdrawn its request subsequent to Board approval.[19]

Let an order consistent with the foregoing be forthwith entered.

Court's Note:

The seven certification forms listed as exhibits in the opinion are not attached. In lieu thereof, sample copy of the judicially-devised Certification and Background Form is, for illustration purposes, appended.

Appendix to follow

---

19. This provision necessarily means that the private schools which voluntarily withdrew their requests when challenged, i. e., Indi-

anola Academy, Hillcrest Academy, West Panola School and North Delta School, are within the ban imposed above.

MISSISSIPPI TEXTBOOK PURCHASING BOARD
CERTIFICATION AND BACKGROUND INFORMATION FORM

1. NAME OF PRIVATE SCHOOL: _____

2. ADDRESS (include county): _____

3. NAME AND TITLE OF OFFICIAL
 COMPLETING FORM: _____

4. GRADES PRESENTLY SERVED BY SCHOOL: _____

5. DATE PRIVATE SCHOOL OPENED
 FOR THE FIRST TIME AND GRADES
 SERVED UPON OPENING: _____

6. DATE ADDITIONAL GRADES
 WERE ADDED (if any): _____

7. ENROLLMENT AND FACULTY BY RACE:

| | Students | | Professional Staff | |
|---|---|---|---|---|
| | White | Black | White | Black |
| Upon Opening | _____ | _____ | _____ | _____ |
| September 1969 | _____ | _____ | _____ | _____ |
| February 1970 | _____ | _____ | _____ | _____ |
| September 1970 | _____ | _____ | _____ | _____ |
| February 1971 | _____ | _____ | _____ | _____ |
| September 1971 | _____ | _____ | _____ | _____ |
| September 1972 | _____ | _____ | _____ | _____ |
| September 1973 (projected) | _____ | _____ | _____ | _____ |

8a. STATE WHETHER STUDENTS ATTENDING
 SCHOOL ARE IDENTIFIED BY RELIGION
 BY SCHOOL RECORDS: _____

b. If yes, state the religion catered to by the school: _____

c. If yes, state the number of students, by religion,
 enrolled in the school in September 1972: _____

d. If yes, state the number of faculty members, by
 religion, employed by the school in September 1972: _____

9. IS THE SCHOOL PRESENTLY RECOGNIZED AS
 EXEMPT FROM FEDERAL INCOME TAXES?
 YES_____ NO_____

 If yes, state the date on which said exemption
 was approved or granted: _____

10. DOES THE SCHOOL MAINTAIN EDUCATIONAL STANDARDS ESTABLISHED BY THE STATE DEPARTMENT OF EDUCATION? _____

11. ARE SCHOLARSHIPS (ACADEMIC OR ATHLETIC) AVAILABLE AT YOUR SCHOOL? _____

If yes, state the number of such scholarships offered during the 1972–73 school year to: a) white sudents _____; and b) black students _____

12. ARE SCHOLARSHIPS AWARDED BY PRIVATE INDIVIDUALS TO STUDENTS OF YOUR SCHOOL? YES_____ NO_____

If yes, state the number of students by race who obtained such scholarship assistance during the 1972–73 school year: a) black students _____; and b) white students _____

13. HAS ANY TUITION DUE THE SCHOOL BEEN WAIVED? _____

If yes, then state the number of students, by race, granted such waiver during the 1972–73 school year: a) white students _____; and b) black students _____

14. ARE ANY BLACK STUDENTS ENROLLED AT YOUR SCHOOL MEMBERS OF ANY ATHLETIC TEAM(S) SPONSORED BY YOUR SCHOOL? _____

If yes, state the number of such students for the 1972–73 school year _____

15a. DOES THE SCHOOL HAVE A WRITTEN AFFIRMATIVE POLICY OF ADMITTING STUDENTS IRRESPECTIVE OF RACE? _____

If yes, attach a copy of that policy and state the date of its adoption by the governing board of the school. _____

b. Has the school publicized this policy in a manner that is intended to and has been reasonably effective in bringing it to the attention of persons of student age (and their families) who are of minority groups, including all non-whites? _____. If yes, attach copies of all notices in all newspapers, brochures, catalogues or printed advertisements appearing or prepared at the time the school was first opened and during the past school year.

c. Has any member of the school's governing board, administrators or faculty taken any action or made any statement qualifying or negating the school's stated policy of open admissions? _____

938

16. STATE THE NAMES AND ADDRESSES
AND RACE OF THE SCHOOL'S:

a) Incorporators:

_____

_____

_____

_____

_____

b) Founders:

_____

_____

_____

_____

_____

c) Board Members:

_____

_____

_____

_____

_____

17. STATE THE NAMES OF INDIVIDUALS,
CORPORATIONS OR ORGANIZATIONS
WHO (WHICH) HAVE CONTRIBUTED
LAND OR BUILDINGS TO THE SCHOOL:

_____

_____

_____

_____

_____

18. STATE WHETHER ANY INDIVIDUAL, COR-
PORATION OR ORGANIZATION LISTED IN
ANSWER TO 16 and 17 HAS ATTEMPTED TO
INFLUENCE THE SCHOOL TO MAINTAIN
RACIALLY SEGREGATED EDUCATIONAL
PROGRAMS.

_____

If yes, state the name of such individual organization
or corporation. _____

19. STATE WHETHER ANY BOARD MEMBER,
OFFICER OF ADMINISTRATOR OF THE
SCHOOL IS PRESENTLY A MEMBER OF
ANY ORGANIZATION ESPOUSING OR AD-
VOCATING RACIAL SUPREMACY OR SU-
PERIORITY.

_____

If yes, list such individual:

_____
_____
_____

I hereby swear (or affirm), under penalties of perjury that the foregoing information is true and accurate to the best of my knowledge, information and belief. I further understand that this affidavit is executed as a condition for supplying Mississippi State-owned textbooks to the above named private school, and that full and accurate answers are required by order of the United States District Court for the Northern District of Mississippi dated July 25, 1973, in civil action No. WC 70–53–K, styled Norwood, et al, v. Harrison, et al, on the docket of the court.

This, _____ day of _____, 197__.

Title: _____

_____
(Name of School)

Sworn and subscribed to
before me this day
of , 19

_____
Notary Public
My Commission Expires:

_____
(SEAL)