Leah Sue BISHOP et al., Plaintiffs,

v.

The STARKVILLE ACADEMY et al., Defendants.

No. EC 74-97-K.

United States District Court,
N. D. Mississippi, E. D.

Dec. 28, 1977.

Melvyn R. Leventhal, New York City, Fred L. Banks, Jr., Jackson, Miss., for plaintiffs.

Giles W. Bryant, Asst. Atty. Gen., Jackson, Miss., for defendants.

Before COLEMAN, Circuit Judge, and KEADY and SMITH, District Judges.

KEADY, Chief Judge:

In this class action litigation [1] brought on behalf of a class consisting of all black school-age children enrolled in the public schools of Humphreys County, Mississippi, and other public schools within the State of Mississippi pursuant to Rule 23(a); (b)(2), F.R.Civ.P., plaintiffs ask this court to declare Miss.Code Ann. § 37–23–61 et seq. unconstitutional to the extent that they authorize the provision of state assistance to private schools which pursue racially discriminatory practices with respect to student enrollment as well as faculty and staff composition.

Parties defendant in this action are Humphreys County Academy [2] and its headmas-

---

1. On October 4, 1977, this action was duly certified as a Rule 23 class action, maintainable under subsection (b)(2), by the initiating judge, whose action we now affirm.

2. When filed, this suit was brought against The Starkville Academy, and its headmaster in addition to the state defendants. By order of this court, prior to the convening of the three-judge court in this cause, these private defendants were dismissed on the ground that they had been improperly joined since it was established that The Starkville Academy had never applied for nor received approval of a program for

ter as well as the State Superintendent and Assistant State Superintendent of Public Education, the State Supervisor of Special Education, and the Treasurer of the State of Mississippi. In addition to the declaratory relief sought, plaintiffs seek a permanent injunction prohibiting disbursal of aid by the state defendants pursuant to Miss. Code Ann. §§ 37–23–61 et seq. (1972) to any private school which engages in racially discriminatory policies and practices.[3] Moreover, plaintiffs seek a mandatory injunction requiring both private and state defendants to return to the State Treasury all funds illegally received or distributed by them, respectively.

The challenged statutes provide for tuition assistance to eligible applicants not exceeding a maximum of $1,000 a year per child. *Id.* § 37–23–61. In addition, the State Department of Education is charged with the responsibility of overseeing programs to ensure the quality thereof. *Id.* § 37–23–67. Those eligible for assistance are statutorily defined as

> Every child who is a resident citizen of . . . Mississippi of educable or trainable mind, under twenty-one (21) years of age, who cannot pursue regular classwork due to reasons of defective hearing, vision, speech, mental retardation, or other mental or physical conditions as determined by competent medical authorities and psychologists, who have not finished or graduated from high school, and who is in attendance in a private or parochial school . . . . *Id.* § 37–23–64.[4]

Humphreys Academy has moved to be dismissed from this cause, alleging as a

basis therefor essentially the same grounds originally urged by The Starkville Academy. In this regard, it is established by stipulation filed on October 28, 1977, that Humphreys Academy has never received any direct or indirect financial assistance under § 37–23–61 since the inception of the program in 1971. Also, it is stipulated that Humphreys Academy presently has neither a special educational program required by § 37–23–61 nor a pending application with the State Department of Education for any disbursal of funds thereunder. Since there is clearly no controversy between plaintiffs and Humphreys Academy and its headmaster, we hold that they were improperly joined in this action and should therefore be dismissed.

The state defendants have moved to dismiss, alleging several alternative bases therefor. Conversely, plaintiffs have moved for partial summary judgment, declaring § 37–23–61 et seq. unconstitutional to the extent that it authorizes direct or indirect financial assistance to racially discriminatory private non-parochial schools and an order enjoining state defendants from providing such assistance, and requiring them to adopt certification procedures similar to those provided by this court's decision in *Norwood v. Harrison,* 382 F.Supp. 921 (N.D.Miss.1974), to insure that no racially discriminatory school can obtain such assistance.

State defendants first contend that plaintiffs and the class they represent lack standing to bring this action, since there is no justiciable controversy with Humphreys

---

exceptional children or any assistance under Miss.Code Ann. § 37–23–61 et seq. (1972). Finding no fault with the initiating judge's reasoning in ordering such dismissal, and in view of the fact that plaintiffs have not attempted to challenge that ruling, we are of the opinion that it should remain undisturbed.

**3.** We note that neither any racially discriminatory private school nor any student receiving aid under the challenged provisions has been properly joined in this action.

**4.** Some ambiguity exists as to whether this definition of "eligible" is expanded by § 37–23–3 which defines an exceptional child as,

*inter alia,* one whose educational needs cannot be met by regular classwork "because of the possession of an exceptionally high degree of intellect, ability or creative talent," and applies to §§ 37–23–1 through 37–23–111. Conversely, § 37–23–61, which specifically governs those provisions concerning financial assistance to exceptional children attending private or parochial schools has remained unchanged and is specifically limited to those children who have some medically diagnosed physical or mental handicaps. This ambiguity, however, does not impugn the validity of our analysis of the applicable law vis-a-vis the facts established herein.

Academy, the only private defendant named herein and their reading of *Runyon v. McCrary*, 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976), to have announced that there is "no such thing as a private white academy," thus making the object of plaintiffs' attack nonexistent. We disagree with the legal conclusion defendants draw from the status of Humphreys Academy in this litigation and their reading of *Runyon*.

■ Dismissal of the academy defendant notwithstanding, we hold that these black plaintiffs who contend that the state defendants' actions pursuant to § 37–23–61 et seq. constitute significant aid to private schools which may be racially discriminatory have " 'alleged such a personal stake in the controversy' as to warrant [their] invocation of federal court jurisdiction and to justify exercise of [this] court's remedial powers on [their] behalf." *Warth v. Seldin*, 422 U.S. 490, 498–99, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975), *quoting Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). Moreover, even though the injury alleged is indirect, it is clearly traceable to alleged omission by state defendants, i. e., failure to adopt a racially nondiscriminatory certification procedure, and therefore plaintiffs may properly seek relief therefrom in this action. See *O'Shea v. Littleton*, 414 U.S. 488, 498, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974); *U. S. v. SCRAP*, 412 U.S. 669, 688, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973). In addition, defendants' claim that *Runyon* precludes this action impermissibly construes that decision as placing an ex-

haustion requirement, albeit limited, upon § 1983 actions such as the one sub judice seeking to have state officials comply with their affirmative constitutional duty to abstain from providing significant public aid to private discrimination. See *Norwood v. Harrison*, 413 U.S. 455, 93 S.Ct. 2804, 37 L.Ed.2d 723 (1973); *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961).

■ The state defendants also seek to rely upon the Education of the Handicapped Act of 1975, 20 U.S.C. § 1401, et seq. They point out that the federal Act specifically requires participating states to bear the costs of providing special education to handicapped children who are placed in private schools by the state. *Id.* § 1413(a)(4)(B). This statute, however, clearly does not countenance public support for private discrimination. For example, one of the eligibility requirements plainly demands that

> The State has established . . . (c) procedures to ensure that testing and evaluation materials utilized for the purposes of evaluation and placement of handicapped children will be selected and administered so as not to be racially or culturally discriminatory.

20 U.S.C. § 1412(5)(C). Moreover, we fail to see how this legislation, designed primarily for the purpose of assuring "a free appropriate public education"[5] for handicapped children, could hardly overrule the constitutional prohibition of public aid to private racial discrimination.

---

5. A "free appropriate public education" is defined as

special education and related services which (A) have been provided at public expense, under public supervision and direction, and without charge, (B) meet the standards of the State educational agency, (c) include an appropriate preschool, elementary, or secondary school education in the State involved, and (D) are provided in conformity with the individualized education program required under section 1414(a)(5) of this title.

20 U.S.C. § 1401(18).

Furthermore, to qualify for assistance under § 1401 et seq., the state must show that

(1) The State has in effect a policy that assures all handicapped children the right to a free appropriate public education [and that]

(B) a free appropriate public education will be available for all handicapped children between the ages of three and eighteen within the State not later than September 1, 1978, and for all handicapped children between the ages of three and twenty-one within the State not later than September 1, 1980, except that, with respect to handicapped children aged three to five and aged eighteen to twenty-one, inclusive, the requirements of this clause shall not be applied in any State if the application of such requirements would be inconsistent with State law or practice, or the order of any court, respecting public education within such age groups in the State. *Id.* § 1412(1), (2)(B).

The state defendants, in recently filed supplemental memoranda, have urged that *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), also compels dismissal of this action or summary judgment in their favor since the ultimate purpose of § 37–23–61 et seq. is to aid handicapped children and their parents, and that plaintiffs have neither alleged nor shown any racially discriminatory motive for enacting the statute. The weakness of defendants' position is readily apparent, for it assumes that *Washington v. Davis* is inconsistent with *Norwood v. Harrison*, 413 U.S. 455, 93 S.Ct. 2804, 37 L.Ed.2d 723 (1973), and *Gilmore v. City of Montgomery*, 417 U.S. 556, 94 S.Ct. 2416, 41 L.Ed.2d 304 (1974), and that the latter decisions were overruled sub silentio.

The plaintiff in *Washington v. Davis,* supra, brought suit alleging that a qualifying personnel test administered by the District of Columbia's Metropolitan Police Department discriminated against black applicants for employment on account of their race because the test excluded a disproportionately high number of blacks. In reversing the Court of Appeals for the District of Columbia Circuit, the Supreme Court held that, unlike the allocation of the burden of proof in Title VII litigation, proof of racially discriminatory impact, standing alone, is insufficient to make out a case of racial discrimination under the equal protection component of the Due Process Clause of the Fifth Amendment: to meet the constitutional burden of proof on such a claim a plaintiff must prove racially discriminatory intent. *Washington,* supra, 426 U.S. at 239–242. Similarly, in *Arlington Heights v. Metropolitan Housing Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), the Supreme Court held that a rezoning denial could not constitute a violation of the Equal Protection Clause of the Fourteenth Amendment where the plaintiffs, though establishing that racially disproportionate impact resulted from such denial, "failed to carry their burden of proving that [racially] discriminatory purpose was a motivating factor in the [challenged] decision." *Arlington Heights,* supra, 429 U.S. at 270, 97 S.Ct. at 566, 50 L.Ed.2d at 468.

Most important, however, for purposes of disposing of defendants' motion is the fact that neither *Washington* nor *Arlington Heights* were concerned with a state's affirmative constitutional duty "to steer clear, not only of operating the old dual system of racially segregated schools, but also of giving significant aid to institutions that practice racial . . . discrimination." *Norwood,* supra, 413 U.S. at 467, 93 S.Ct. at 2812. Thus, defendants' contention that *Washington* and its progeny abrogated *Norwood*'s principle must be rejected as faulty reasoning.

Defendants' argument, a fortiori restricting *Norwood* to granting a right of action by persons injured by state action which significantly aids discriminatory private schools rather than reiterating a well-established absolute constitutional duty of the state to refrain from participating in such action, *see Cooper v. Aaron,* 358 U.S. 1, 19, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958), is based upon a perceived inconsistency between *Norwood* and the subsequent holdings in *Washington* and *Arlington Heights.* Rejecting the State's argument that textbook aid was primarily designed to provide equal educational tools to all students, even though some parents might choose to place their children in a racially discriminatory institution, the Supreme Court in *Norwood* reasoned that:

> Good intentions as to one valid objective do not serve to negate the State's involvement in violation of a constitutional duty. "The existence of a permissible purpose cannot sustain an action that has an impermissible effect." *Wright v. Council of City of Emporia* [407 U.S. 451, 92 S.Ct. 2196, 33 L.Ed.2d 51] . . . . The Equal Protection Clause would be a sterile promise if state involvement in possible private activity could be shielded altogether from constitutional scrutiny simply because its ultimate end was not discrimination but some higher goal. . .

In any event, the constitutional infirmity of the Mississippi textbook program is

that it significantly aids the organization and continuation of a separate system of private schools which . . . may discriminate if they desire to do so. -
*Norwood,* supra, 413 U.S. at 466–67, 93 S.Ct. at 2812. To the contrary, *Washington* and *Arlington Heights* carefully noted and analyzed prior Supreme Court decisions, see, e. g., *Wright v. Council of City of Emporia,* 407 U.S. 451, 92 S.Ct. 2196, 33 L.Ed.2d 51 (1972); *Palmer v. Thompson,* 403 U.S. 217, 91 S.Ct. 1940, 29 L.Ed.2d 438 (1971), which were viewed as possibly inconsistent with the principle that proof of a racially discriminatory purpose was indispensable to sustain a claim of racial discrimination under the Fourteenth Amendment's Equal Protection Clause. Significantly, however, neither *Norwood* nor *Gilmore* was cited or discussed in either *Washington* or *Arlington Heights.* The explanation for this silence is quite clear: there is no inconsistency in these Supreme Court decisions.

The provision of significant state aid, in the form of textbooks in *Norwood* and city facilities in *Gilmore,* to racially discriminatory private schools constituted a violation of the state's constitutional duty to refrain from such action. *Washington-Arlington Heights* hold that a racially discriminatory purpose must be shown in order to make out a case of *racial discrimination* under the Equal Protection Clause. The case made in the *Norwood-Gilmore* context is not one of racial discrimination, but that the state had breached its affirmative duty not to provide significant aid to racially discriminatory private schools. Thus, even under defendants' application of the *Washington-Arlington Heights* rationale to such a situation, a plaintiff would have to show only that a purpose to provide aid to racially discriminatory, as well as nondiscriminatory, educational institutions was a motivating factor for the state's authorization and provision of such aid, *Arlington Heights,* 429 U.S. at 252, 97 S.Ct. at 555, 50 L.Ed.2d at 450, and that the aid was, in fact, significant. *Norwood,* 413 U.S. at 467, 93 S.Ct. 2804.

Where, as here, a state legislature authorizes the provision of financial assistance and the appropriate state agents disburse funds pursuant to such authorization to all private · schools, or to their patrons who otherwise qualify therefor, even though some or all of such institutions may discriminate on the basis of race, it would, we think, be clearly unreasonable to conclude that providing aid to discriminatory as well as nondiscriminatory institutions was not a motivating factor for either action. Indeed, defendants concede that the purpose of § 37–23–61 et seq. was to provide aid to all handicapped children; and *"all"*, in this context, necessarily includes students who may attend racially discriminatory private schools. Our conclusion is substantiated by the fact that the passage of the challenged statute in 1971 occurred at a time when the number of all-white private schools in Mississippi experienced a marked period of growth following closely upon massive desegregation mandated for the state's public schools, see *Norwood,* 413 U.S. at 457, 93 S.Ct. 2804. Despite the Supreme Court's clear statement in *Norwood* of the state's broad affirmative duty to the contrary, and in the face of this court's articulation of a generally applicable nondiscriminatory certification procedure for private schools, *Norwood v. Harrison,* 382 F.Supp. 921, 935– 39 (N.D.Miss.1974) (on remand), the state defendants have nevertheless continued to provide aid under § 37–23–61 et seq. to private schools which have neither applied · for nor have been granted free textbook aid under *Norwood's* guidelines. Therefore, if we concede the applicability of *Washington* to the case sub judice, the only evidentiary question left is whether the financial assistance by the state to private schools, which may be racially discriminatory, is significant within the meaning of *Norwood.*

On the other hand, if *Norwood* is simply viewed as an affirmation of the state's absolute constitutional duty not to make such aid available to those institutions, then *Washington's* analysis of the burden of proof in an attempt to show racial discrimination is inapposite since proof of the requi-

site intent to sustain an equal protection claim is subsumed in proof necessary to show violation of the state's absolute duty not to provide significant aid. From this perspective, *Norwood* recognized that the state could not act pursuant to a broad legislative authorization of aid to *all* schools, unlimited by a nondiscrimination certification procedure, thereby providing significant aid to racially discriminatory private schools without intent to accomplish this impermissible result. In any event, reading *Norwood* to have reaffirmed an absolute prohibition in supplying state-owned textbooks, *Norwood* also requires plaintiffs in this case to show only that state defendants have made significant financial assistance available to institutions which may discriminate on the basis of race. Therefore, on the present record, construing *Norwood* either as an absolute prohibition of state participation in private discrimination or as merely recognizing a cause of action arising under the Fourteenth Amendment in which plaintiffs must satisfy the element of discriminatory intent stressed in *Washington*, only one issue must be resolved to dispose of plaintiffs' motion for summary judgment. That issue is whether § 37–23–61, and the administrative procedure through which the program for handicapped children is implemented, "significantly aids the organization and continuation of a separate system of private schools which . . . may discriminate if they so desire." *Norwood*, 413 U.S. at 467, 93 S.Ct. at 2812.

▆▆▆ The monetary tuition provided for in the challenged legislation is typical of tangible financial aid, as distinguished from generalized services the state may legitimately provide to schools in common with others, which, if it "has a significant tendency to facilitate, reinforce, and support private discrimination," *Norwood*, 413 U.S. at 466, 93 S.Ct. at 2811, is constitutionally prohibited. The stipulated facts reveal that from August 1974 to October 1977, 29 private, non-parochial schools had state-approved special education programs. Of these 29, only 5 had, as of October 6, 1977, either been approved for, or had received, textbook aid under *Norwood*'s guidelines. The amount of funds disbursed to or requisitioned by students enrolled in these 29 schools ranged from a low of $144 for the Easter Seal Speech & Language Clinic at Vicksburg for 1975–76 to a high of $72,152 for The Education Center for 1976–77; total funds distributed or requisitioned for 1976–77 school year amounted to $433,217 (See appendix). Upon the basis of this evidence, it is manifestly clear that state aid to private, non-parochial schools pursuant to § 37–23–61, et seq., is significant within the meaning of *Norwood*, and since the state defendants have made this aid available to such schools which may discriminate because of race if they so desire, the statute, *as applied,* falls outside the parameters of constitutionally permissible state action. Thus, plaintiffs are entitled to summary judgment on that issue. Even so, we are of the opinion that the relief requested by plaintiffs for reimbursement of funds to the state treasury is not proper since neither an institution identified and proved to be a racially discriminatory private, non-parochial school, nor, for that matter, has any individual recipient been properly joined as a defendant herein. On the other hand,

[t]he proper injunctive relief can be granted without implying that all private schools [shown] to be receiving . . . aid [under § 37–23–61, et seq.] are in fact practicing restrictive admissions policies.

*Norwood*, 413 U.S. at 471, 93 S.Ct. at 2813. Therefore, we conclude that this cause should be remanded to the initiating judge who shall require the state defendants to adopt a case by case application of the principles of the *Norwood* nondiscrimination certification procedure as specified in that court's opinion at 382 F.Supp. 921.

Let an order issue accordingly.

Exhibit A to follow

## EXHIBIT A

### Private Non-Parochial Schools Having Approved Special Education

### Programs for Eligible Children Under Section 37–23–61, et seq., Miss. Code of 1972

NAME OF SCHOOL — Funds Issued to or Requisitioned by Students Enrolled in School

| Mississippi Schools | School Years 1974–75 | 1975–76 | 1976–77 | | Presently Receiving State Textbook Aid | Never Received Textbook Aid |
|---|---|---|---|---|---|---|
| 1. Achievement Center, The | $2,340 | $7,644 | $2,520 | . . . | | X |
| 2. Canton Academy | 24,800 | 41,988 | 38,921 | . . . | | |
| 3. Central Academy | 24,350 | 29,670 | 25,471 | . . . | | X |
| 4. Chatterbox, The | 4,135 | 6,005 | 5,916 | . . . | | X |
| 5. Clarksdale Speech & Hearing Center | 8,300 | 7,613 | 2,256 | . . . | | X |
| 6. Clay County Association for Retarded Children | 28,090 | 34,271 | 36,446 | . . . | | X |
| 7. Coastal Medical Center | 2,622 | None | None | . . . | | X |
| 8. College Hill Academy | 3,400 | None | None | . . . | | |
| 9. Delta School for Exceptional Children | 5,947 | 5,200 | 3,747 | . . . | | X |
| 10. Easter Seal Speech & Language Clinic—Jackson | 365 | 144 | 570 | . . . | | X |
| 11. Easter Seal Speech & Language Clinic—Vicksburg | None | None | 1,302 | . . . | | X |
| 12. Education Center, The | 57,854 | 66,590 | 72,152 | . . . | X | |
| 13. Gulf Coast Education Center | 5,693 | 11,927 | 10,122 | . . . | * | |
| 14. East Holmes Academy | None | None | 4,541 | . . . | | |
| 15. Harrison County Association for Retarded Children | 11,417 | 2,200 | None | . . . | | X |
| 16. Heritage School for Exceptional Children | 13,296 | 20,712 | 24,979 | . . . | X | |
| 17. Audiology, Speech and Language Clinic | None | None | 1,956 | . . . | | X |
| 18. Jackson Speech & Hearing Clinic | 3,805 | 7,692 | 6,462 | . . . | | X |
| 19. Leflore County School for Handicapped Children | 27,583 | 33,521 | 26,760 | . . . | | X |
| 20. Magnolia Speech School for the Deaf | 27,571 | 58,846 | 53,749 | . . . | X | |
| 21. Manchester Academy | 10,600 | 23,977 | 31,515 | . . . | | |
| 22. Mississippi Achievement Center | 1,733 | None | None | . . . | | X |
| 23. Washington County Day School | 10,800 | 12,237 | 10,913 | . . . | | X |
| 24. Willowood Development Center | 43,222 | 65,281 | 70,551 | . . . | X | |
| 25. Speech and Language Center | 1,470 | 1,962 | 966 | . . . | | X |
| 26. Mary Marshall Speech & Language Services | None | 6,816 | 3,999 | . . . | | X |
| 27. Therapeutic Services | None | None | 1,944 | . . . | | X |
| 28. Educational Resource Center | None | 781 | None | . . . | | X |
| 29. Tunica Institute | 3,600 | 800 | None | . . . | | |

\* While having been approved, this school does not presently receive textbook aid.