Oless BRUMFIELD, as next friend of Ervin Brumfield, et al.

v.

William J. DODD, Superintendent of Public Education of the State of Louisiana, et al.

Civ. A. No. 71–1316.

United States District Court, E. D. Louisiana.

Dec. 13, 1976.

Supplemental Order. Jan. 11, 1977.

---

George M. Strickler, Jr., New Orleans, La., for plaintiffs.

J. Stanley Pottinger, Asst. Atty. Gen., Alexander C. Ross, Thomas M. Keeling, Paul F. Hancock, Lawrence L. Newton, Dept. of Justice, Washington, D.C., Gerald J. Gallinghouse, U.S. Atty., Leonard P. Avery, Asst. U.S. Atty., New Orleans, La., for intervenors.

William J. Guste, Jr., La. Atty. Gen., Warren E. Mouledoux, First Asst. Atty. Gen., William P. Curry, Jr., Asst. Atty. Gen., for defendants J. Kelly Nix, La. Su-

perintendent of Public Ed., La. State Bd. of Elementary and Secondary Ed. (substituted for La. State Bd. of Ed. and its individual members), and Mary Evelyn Parker, La. State Treasurer.

Richard B. Crowell, Crowell, Owens & Tudor, Alexandria, La., for Alexandria Country Day School.

Sidney Dean, Mayor, Ida, La., for Caddo Community School.

Robert G. Pugh, Pugh & Nelson, Shreveport, La., for Grawood Christian Schools.

Harry B. DeKay, Jr., Principal, New Orleans, La., for Prytania Private School.

James R. McClelland, Aycock, Horne, Caldwell, Coleman & Duncan, Franklin, La., for West End Academy.

John T. Campbell, Campbell, Campbell & Johnson, Minden, La., for Glenbrook School of Minden, Inc.

HEEBE, Chief Judge.

Previously, on December 2, 1975, this Court issued an opinion holding that state assistance in Louisiana to private, racially segregated schools in the form of textbooks, class room materials and finances for transportation was unconstitutional. (at 405 F.Supp. 338) As a result, defendant Louisiana State Board of Elementary and Secondary Education was ordered by the three-judge court to initiate a certification procedure to determine the eligibility of all private schools in the state desirous of the continuation of such assistance in light of its decision. The defendant having complied with the order, this Court, sitting as a single judge, heard evidence regarding the eligibility of ten schools for assistance, nine which were challenged by plaintiffs and the government and one which was decertified by the state. These schools are Alexandria Country Day School, Caddo Community School, Prytania Private School, Glenbrook School of Minden, West End Academy, Grawood Christian School and the Plaquemine Parish Independent Schools, which is made up of the East Side School Association, Bu-

ras School Association, Belle Chasse School Association and Port Sulphur School Association.

At the outset, two of these schools— Alexandria Country Day School and Grawood Christian School—assert that the proceedings held by the Court are improper as to them. Alexandria Country Day takes the position that it was an indispensable party to the original suit, and since it was not joined, this Court now has no jurisdiction over it. Grawood Christian School approaches this issue by seeking, alternatively, intervention of right as an indispensable party under F.R.Civ.P. 24(a) or permissive intervention. under F.R.Civ.P. 24(b). We turn first to the question of whether Alexandria Country Day and Grawood Christian were indispensable parties to the original action and whether they must be made a party now that their eligibility has been questioned. The court in *American Civil Liberties U. of Md. v. Board of Public Wks.*, 357 F.Supp. 877 (D.Md.1972), faced a similar problem in the context of F.R.Civ.P. 19(a)(2) which deals with joinder of necessary parties at the early stages of an action challenging the constitutionality of a Maryland statute authorizing state aid to nonprofit private colleges and universities. We agree with the court's conclusion in the ACLU case, *supra* at 884, stated under the applicability of Rule 19(a)(2):

"Rule 19(a)(2) provides that the nonparties should be joined in an action when the decree might be detrimental to them. But the Rule does not require a court to join all persons whose interests might conceivably be affected by the decision in the case. * * * The fact that all recipients of aid under a challenged statute have a financial interest in the continuation of that statute does not lead inevitably to a conclusion that all aid recipients *must* be joined as parties. (The nonparty aid recipients could move for intervention under Rule 24 if they are concerned that their interest in this case justify the burden that entering into the litigation would place upon them.)"

In agreeing with this position, we also conclude that the schools were not indispensable parties to the original action.

▮▮▮ This conclusion leads us to the next question of whether or not Grawood should be permitted to intervene as of right or on a permissive basis. "Intervention of Right" under F.R.Civ.P. 24(a)(2) is couched in the same language as Rule 19(a)(2) and, therefore, our conclusion that the schools are not indispensable parties would likewise apply to Grawood's request to be allowed to intervene as of right, which we deny. With respect to permissive intervention, Rule 24(b) requires timely application. This requirement is considered a condition precedent and, as earlier noted, the decision in this case was rendered on December 2, 1975. The question of timeliness is one left to the judge's discretion and is to be determined from all the circumstances. *Nevilles v. Equal Employment Opportunity Com'n,* 511 F.2d 303, 305 (8th Cir. 1975); *see, also, Leech Lake A. Cit. Com. v. Leech Lake Band of Chippewa Ind.,* 486 F.2d 888, 889 (8th Cir. 1973). After serious consideration, this Court is of the opinion that the request to intervene is untimely. Although no schools are parties, the interest of all private schools was well represented by the state's attorneys. The legal issues were carefully considered by three judges. All individual schools which had a need for an opportunity to be heard on the question of their eligibility for state aid have been given that opportunity. No useful purpose could be served by permitting intervention at this time, and the request will be denied.

In addition to all of the foregoing, it does not appear to us that the Supreme Court contemplated any other kind of direct participation in the action by individual private schools other than in the manner which was followed by this Court. We quote from the Supreme Court's opinion in *Norwood v. Harrison,* 413 U.S. 455, 471, 93 S.Ct. 2804, 2813, 37 L.Ed.2d 723 (1972), as follows:

"The proper injunctive relief can be granted without implying a finding that all the private schools alleged to be receiving textbook aid are in fact practicing restrictive admission policies. * * * The District Court can appropriately direct the appellees to submit for approval a certification procedure under which any school seeking textbooks for its pupils may apply for participation on behalf of pupils. * * * *The State's certification of eligibility would, of course, be subject to judicial review.*" (emphasis added)

With respect to the merits of this matter, we agree with and rely on the approach taken by the court in *Norwood v. Harrison,* 382 F.Supp. 921 (N.D.Miss.1974), regarding eligibility hearings, as we previously relied on that court in adopting our certification procedure. The court in *Norwood, supra* at 924–925, set the standard for plaintiffs' satisfying their burden of establishing a *prima facie* case against each school as follows:

"The quantum of proof required to make out a prima facie case, which is of critical importance, is to be considered within the context of each case. However, for those private academies serving elementary and secondary grades, or both, which were established during the wake of massive desegregation orders of federal courts, we believe that a prima facie case of racial discrimination arises from proof (a) that the school's existence began close upon the heels of the massive desegregation of public schools within its locale, and (b) that no blacks are or have been in attendance as students and none is or has ever been employed as teacher or administrator at the private school. We do not, of course, intimate that plaintiffs initial burden cannot be carried by additional buttressing proof for those schools not established to provide a segregated alternative to public school desegregation. But, the critical time of a private school's formation or unusual enlargement must be a significant factor, though one not necessarily decisive, in determining whether it is racially discriminatory."

If plaintiffs establish a *prima facie* case against a particular school, *Norwood, supra* at 926, then set the following standard for

what the school must prove in order to rebut the *prima facie* case:

"The question next arising goes to the sufficiency and strength of rebuttal evidence offered by a school; if none is offered, an inference of discrimination becomes unassailable. At this point it is important to emphasize that the ultimate issue in administering Mississippi's textbook program to private schools is not whether black students are actually enrolled at the school, but whether their absence is because the school has restrictively denied their access; simply, does the school have a racially discriminatory admissions policy? Thus, concerning plaintiffs' proof that no blacks presently attend or have ever attended a particular school formed as an alternative to desegregated public schools in the community, rebuttal evidence may not be limited to mere denials of a purpose to discriminate; rather, to be effective, the evidence must clearly and convincingly reveal objective acts and declarations establishing that the absence of blacks was not proximately caused by such school's policies and practices. Once the inference is repelled, plaintiffs would be obliged to offer evidence of specific discrimination. School officials may, therefore, overcome a prima facie case against their school by proof of affirmative steps instituted by the school to insure the availability of all of its programs to blacks who may choose to participate. Illustrative steps of this type would certainly include proof of active and vigorous recruitment programs to secure black students or teachers, including student grants-in-aid, proof of continued, meaningful public advertisements stressing the school's open admissions policy, proof of communication to black groups and black leaders within the community of the school's nondiscriminatory practices, and similar evidence calculated to convince one that the doors of the private school are indeed open to students of both the black and white races upon the same standards of admission."

With these principles from *Norwood, supra,* as our guidelines, we will proceed to discuss the facts as we find them relative to each school. These findings are based on evidence introduced at the hearings and documents which have been lodged in the record, mainly from the individual school Certification and Background Information Form.

### 1. *Alexandria Country Day School*

The Alexandria Country Day School was opened in September 1969, which event coincided with the first integration of the Rapides Parish public schools under a district court order requiring other than freedom-of-choice. At that time, the school contained grades one through eight and enrolled 98 white students. On March 2, 1970, the Fifth Circuit Court of Appeals reversed the decision of the district court and remanded the case with instructions to implement one of the HEW plans calling for pairing of schools. Finally, on September 1, 1970, the district court ordered implementation of a modified HEW plan, and the school's enrollment climbed to 314 students. In subsequent years, the school added grades nine through twelve. Its enrollment as of September 1975 was 221 students. The faculty and student body of the school is presently, and always has been, all white. On this showing, the plaintiffs and the government have made out a *prima facie* case.

Beyond the *prima facie* case, additional evidence was presented. In 1970, the school was planning to purchase a school building owned by the Rapides Parish School Board, which it was leasing at the time. Suit was brought to prohibit the sale of the structure on the ground that Alexandria Country Day was racially segregated and that the sale of school board property to it would interfere with public school integration, and the School Board did drop their plans to sell the school. In addition, there was testimony that members of the black community believed the school had been created to allow affluent whites to flee integrated public schools and that it continued to maintain a racially discriminatory policy.

In rebuttal, Alexandria Country Day produced some weak testimony that the school had made overtures to black parents and leaders in the black community in an attempt to enroll black children in the school. Some of this testimony was rebutted and the Court finds as a matter of fact that there is no "active and vigorous" recruitment program for black students. As a matter of fact, Alexandria Country Day has athletic and academic scholarships available, yet it appears that no black student has ever been offered such a scholarship. Finally, the school's Articles of Incorporation were not amended to reflect a nondiscriminatory admission policy until January 1976, well after this Court's decision on the merits, and newspaper announcements containing a nondiscriminatory admission statement were not published until after the school was advised that such published announcements were necessary to maintain the school's IRS tax exemptions.

### 2. *Prytania Private School*

In September 1960, during the first year that the Orleans Parish Public Schools were operated under a freedom-of-choice order, Harry DeKay, a former public school teacher, opened Prytania Private School. He is very proud of the fact that the school enrolls Spanish students, foreign students and handicapped children, including a deaf boy. However, the school has never enrolled a black student or employed a black teacher. Prytania has never publicized a nondiscriminatory admissions policy in any way and has never applied for tax exempt status. Mr. DeKay has no explanation for this. One of the most damaging facts brought out at the hearing is that Prytania is a member of the Louisiana Independent School Association (LISA), an organization of private schools which publicly maintains a racist policy and has advised its members openly how to discourage black enrollment.

Mr. DeKay testified that he had an open admissions policy and that no applicant would be denied enrollment because of race. However, to date, there have been no efforts made to recruit black students or teachers to the school. Mr. DeKay's testimony totally failed to rebut the *prima facie* case against Prytania Private School.

### 3. *Caddo Community School*

Caddo Community School appears to be an example of how integration can be thwarted in a given area. The school is located in the small town of Ida in the extreme northeast corner of Caddo Parish which, in 1969, lost its public all-white elementary school. The public school was closed as part of the desegregation plan submitted to the district court by the Caddo Parish School Board. Caddo Community School was formed and began operation in September 1969 in the old public school as a reaction to this closing. In that year, the school enrolled 64 white students in grades one through eight. A ninth grade was added in January 1970. In February 1970, the district court issued the first desegregation order for Caddo Parish calling for something other than freedom-of-choice. Thereafter, in September 1970, Caddo Community's enrollment jumped to 320 students. The faculty and student body of the school are, and always have been, all white. In addition, the school is a member of LISA, a fact which the Court has already cited with disapproval. The Court believes that all of the foregoing make up a *prima facie* case.

Caddo's rebuttal was in the form of the testimony of Sidney Dean, Mayor of Ida and one of the school's founders. He sought to distinguish between opening the school to avoid integration and opening it to maintain a neighborhood school. However, as previously noted, the neighborhood *public* school was closed as a part of a desegregation plan. Most detrimental to Caddo's case is the fact that in September 1970, subsequent to the Caddo Parish desegregation order, the school was expanded to include high school grades. The public high school in Ida had been closed in 1955 for economic reasons and at that time the students were bussed to neighboring public schools. The school did not seek tax exempt status until 1971. Furthermore, no effort has been made to recruit black stu-

dents or teachers. Caddo Community has not, in our view, rebutted the *prima facie* case.

#### 4. *Glenbrook School of Minden, Inc.*

The Glenbrook School of Minden appeared at its hearing in a different position than the other nine schools involved in these proceedings. Glenbrook is the only one which was declared ineligible by the State Board for assistance, and it now challenges its decertification. The school came into existence on the heels of integration. The first order effectively integrating the public schools of Webster Parish was entered on January 24, 1970, and Glenbrook began operating in February 1970. It first enrolled 160 students in grades one through eleven and then added a twelfth grade in September 1970. The student body and faculty of the school are, and always have been, all white. Glenbrook is a charter member of LISA. We think that these facts add up to a *prima facie* case of a discriminatory admissions policy.

Glenbrook called several witnesses in rebuttal who testified that the school did not have a discriminatory admissions policy. However, the Court did not find their testimony credible, especially in view of the fact that the school was opened *at mid-term* after the desegregation order. In addition, Glenbrook's faculty was then made up of teachers who either retired from or "dropped out" of the public school system. As with the schools previously discussed, Glenbrook has made no attempt to recruit either black students or black faculty. Its evidence did not rebut the *prima facie* case established against it, if this was necessary since the State Board itself decertified Glenbrook.

#### 5. *Grawood Christian School*

Plaintiffs and the government do not contest the fact that Grawood Christian School's formation in 1960 was unrelated to school desegregation. Its purpose, as stated, was to provide a fundamental Christian education not available from the public schools. Grawood is also located in Caddo

Parish in a suburb of Shreveport. It began operations in 1960 as a church-related elementary school with grades one through six. Seventh and eighth grades were added in 1963 and 1964. Eight years after it was formed, its student body numbered 161, and the school had to discontinue the seventh and eighth grades because of financial difficulties. Then, in February 1970, the schools in Caddo Parish were ordered to desegregate. The enrollment of Grawood swelled to 478 students and the school was then able to add the seventh, eighth and ninth grades. In 1971, 1972, and 1973, the school was able to add the final high school grades, tenth, eleventh and twelfth grades. Previously, its students attended public high schools after finishing the eighth grade. Also, at this time, the school's enrollment rose to 948 students. With the growth of the student body, Grawood was able to expand its physical facilities and institute its own transportation program. The school has always had an all-white student body and faculty, and in the important year of 1970 Grawood became a member of LISA.

Several witnesses took the stand in Grawood's defense. One of them, a Mr. Barker who was the former school treasurer, testified that he thought the large number of parents who enrolled their children in Grawood after the desegregation order were more interested in removing their children from the integrated public schools than in providing them with a Christian education. He also testified that the school belonged to LISA to take advantage of its athletic program but that the school did not agree with the organization's racist beliefs and practices. However, the school has never formally repudiated the policies of the organization. It was not until 1971 that Grawood first published advertisements stating that its admission policy was nondiscriminatory. But this was in response to the IRS informing the school that such a published statement was necessary to maintain the school's tax exempt status. Grawood recruits its faculty from a college whose basic tenet is that segregation of the races is God's inten-

tion. In addition, there has been no recruitment, active or otherwise, on the school's part of black students or teachers. The court in *Norwood, supra* at 925, equates an unusual enlargement of a private school with the formation of one at the time of integration as a factor in determining whether it is racially discriminatory. This is what happened to Grawood, and they were willing to take advantage of the white flight from the public schools. Since that time, it has taken no meaningful action to remedy the situation and should not be entitled to state assistance.

### 6. *West End Academy*

West End Academy is located in St. Mary Parish, and on July 29, 1969, the district court in that district ordered desegregation of the public schools by a method other than freedom-of-choice. In response to this order, West End was opened in September 1969 with two grades. Additional grades were added between 1970 and 1974, and the school currently enrolls approximately 200 students in grades kindergarten through twelfth. From 1969 through the 1975–76 school year, West End had an all-white student body and faculty. However, after the school was notified that its certification was being challenged by plaintiffs and the government in these proceedings, it admitted a single black student to the school in September 1976.

During the defense put on by West End, it was admitted by a member of the school's Board that West End was founded to provide an education in an "orderly environment" which could not be found in the newly integrated public schools. In addition, it was brought out that it was not until 1971 that the school first published a statement of nondiscriminatory admissions policy in a newspaper advertisement, and this was only after the IRS notified it that such action was necessary in order to maintain tax exempt status. Subsequent to this, and over the opposition of a number of members of the school's Board, the school amended its Articles of Incorporation to include a nondiscriminatory clause. West End has no recruitment policy to enroll or employ black students or teachers. All of the faculty is white. There was testimony at the hearing that the black community regards West End as a school for whites who do not want integration. That a single black student was admitted on application and not on recruitment at a critical time does not overcome this. Nor do we think that the admission of one black student constitutes "active and vigorous" action in order to overcome a conclusion of disqualification for assistance at this time.

### *The Plaquemines Parish Independent School System*

7.  Promised Land Academy (East Side School Association)
8.  Delta Heritage Academy (Buras School Association)
9.  River Oaks Academy (Belle Chasse School Association)
10. McBride Academy (Port Sulphur School Association)

Plaquemines Parish Independent School System appears to be a mirror image of the public school system. It has a private school system composed of four related schools with common educational, admission and employment policies, administered by its own superintendent. The system was admittedly formed in opposition to the foreshadow of integration of the Parish's public school system. A very significant percentage of white students and teachers left the public schools to form the student bodies and faculties of the private schools and the private system has remained all white ever since. There is no question but that the schools involved maintain a discriminatory policy. (See specifically the findings of the late Judge Herbert Christenberry in *United States v. Plaquemines Parish School Board*, C.A.No. 66–71, August 29, 1966.) The schools began operation with student bodies and faculties lifted from the *white* public schools, and their combined enrollment was in excess of 2,200 students. These schools introduced no meaningful, if any, evidence

on rebuttal to even suggest that they did not employ a racially discriminatory policy.

■ In conclusion, the Court does not feel that it can approve any of the schools involved in these proceedings for state assistance at this time. This does not, of course, mean that the picture cannot change in the future with the appropriate action being taken by these schools as spelled out here and in *Norwood*. Accordingly, the Court directs the plaintiffs and the government jointly to present it with an appropriate form of order.

## SUPPLEMENTAL ORDER

Pursuant to the certification procedure proscribed in the Court's order of December 2, 1975, the State Department of Education certified as eligible for state assistance a number of private schools. The government and private plaintiffs objected to the eligibility of the fourteen schools listed below:

1. Alexandria Country Day School
2. Belle Chasse School Association (River Oaks Academy)
3. Briarfield Academy
4. Buras School Association (Delta Heritage Academy)
5. Caddo Community School
6. Eastside School Association (Promised Land Academy)
7. Glenbrook School of Minden, Inc.
8. Grawood Christian Schools
9. Natchitoches Academy
10. Port Sulphur School Association (McBride Academy)
11. Prytania Private School
12. West End Academy
13. West Side Academy
14. Winn Academy

Hearings were conducted on the eligibility of ten of the schools. Briarfield Academy, Natchitoches Academy, West End Academy and Winn Academy chose not to appear, and the prima facie case of discrimination presented against those schools went unrebutted. On December 13, 1976, the Court determined the remaining ten schools to be racially discriminatory and therefore ineligible for state assistance of any kind. The same ruling, of course, applies to the four schools which did not put on a defense.

All fourteen schools are thus currently ineligible for state assistance of any kind, including textbooks, materials and transportation. The Court is aware, however, that most of these schools started the current school year with state-owned textbooks, and children attending those schools will be deprived of textbooks if the state books are removed from the schools before replacement books may be purchased. The intent of this order is to allow the continued use of only those textbooks currently being used by students attending the aforementioned schools until such time as those schools, moving as rapidly as possible, have obtained replacement books, but in no event past May 31, 1977. To insure that the private schools begin immediately to purchase books, it is a condition of their temporary retention and use of the state books that they demonstrate to the State Department of Education, to counsel for the government and private plaintiffs, and to the Court, that they have in fact ordered and paid for replacement books. Accordingly,

IT IS HEREBY ORDERED,

1. The fourteen schools listed above shall immediately return all state-owned textbooks not currently being used for instructional purposes to the Department of Education.

2. Each private school wishing to temporarily retain state textbooks shall immediately purchase (order and pay for) private textbooks. Each such school shall furnish to the Department of Education, counsel for the government and the private plaintiffs, and the Court, the following within fourteen days of this date:

   a) the name and address of the textbook supplier,

   b) the date on which the order was placed,

c) the titles of the books and number of each title purchased,

d) the price per book,

e) proof of payment (receipt, cancelled check, etc.), and

f) a statement as to when the books will be available.

The Department of Education shall inform each of the private schools of the terms of this order and of the conditions which must be met in order for the schools to temporarily retain the textbooks. If any school fails to comply with the conditions of this paragraph, the Department of Education shall collect the books held by that school forthwith.

3. As soon as the textbooks purchased by the above-named private schools are received, the schools shall immediately return the state-provided textbooks to the Department of Education. In no event shall any of the private schools retain state textbooks beyond May 31, 1977. On or before June 7, 1977, the Department of Education and/or its agents shall insure that all state-provided textbooks, library books, school supplies or other tangible materials in the possession of the aforementioned private schools or in the possession of the students attending those schools are collected.

4. The defendant State Department of Education shall conduct an on-site inspection and inventory of the materials collected from the above-named private schools. After verifying that all materials have been collected, the Department shall take appropriate action to insure that the materials are not sold, loaned, or otherwise returned to the aforementioned racially discriminatory private schools, or the students attending those schools.

5. Students attending the Briarfield Academy in East Carroll Parish are presently being transported on public school busses operated by the East Carroll Parish School Board with state assistance. Unless that practice is ceased immediately, the Department of Education is ordered to stop all payment of funds for transportation to that School Board.

6. The Plaquemines Parish Independent Schools (River Oaks Academy, Delta Heritage Academy, Promised Land Academy and McBride Academy) are presently the recipients of state funds for transportation. These funds are paid by defendant State Department of Education directly to the Plaquemines Parish Commission Council which operates a school bus system for both private and public school children. Henceforth, the State Department of Education shall pay to the Commission Council and/or the Plaquemines Public School System only that allotment of funds justified by the number of public school students being transported by the system. The State Department of Education shall also recover from the Commission Council that portion of funds already paid to, but not spent by, the Commission Council for the transportation of private school students attending the four above-named schools.

7. The Court incorporates by reference its order of December 2, 1975, which directed the defendants to give a complete accounting of all public aid which they have provided since June 1968 to private schools found to be racially discriminatory on challenge.

8. The defendants shall submit a Report to the Court, with a copy to counsel, containing the above accounting information as well as a list of all state materials returned, the date said materials were returned, the date of the on-site inspection, required in paragraph 4, *supra,* and the name of the private schools which returned the materials. This Report shall be submitted not later than June 14, 1977.