CALHOUN ACADEMY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6595-88X.          Filed March 1, 1990.

*Mark W. Nickerson* and *David E. Spalten*, for the petitioner.

*George J. Blaine*, for the respondent.

## OPINION

NIMS, *Chief Judge:* Respondent determined that petitioner does not qualify for exemption from Federal income tax under section 501(c)(3). (Unless otherwise indicated, all section references are to the Internal Revenue Code and all Rule references are to the Tax Court Rules of Practice and Procedure.) Petitioner challenges respondent's determination by invoking the jurisdiction of this Court for a declaratory judgment pursuant to section 7428. The issue for decision is whether petitioner has a racially nondiscriminatory policy as to students.

This case was submitted for decision under Rules 122 and 217 on the basis of a stipulated administrative record, which is incorporated herein by reference. The facts as represented in the administrative record are assumed to be true for the purposes of this proceeding. Rule 217(b)(1).

Petitioner, The Calhoun Academy, with its principal office located in St. Matthews, Calhoun County, South Carolina, was organized as a nonprofit corporation in South Carolina on December 30, 1969. Petitioner's certificate of incorporation of that date states its purpose as—

exclusively educational; to promote, own, and operate a system of independent schools and to possess and have all powers and privileges necessary and proper for the attainment of its aims. In the event of dissolution, the residual assets of this organization will be turned over to another organization which is exempt from Federal Income Tax as an organization described in 501(c)(3) of the Internal Revenue Code of 1954, or the corresponding provision of a prior or future Internal Revenue Code, or to the Federal, State or local Government.

During 1969 and 1970, the public schools in Calhoun County were subjected to court-supervised desegregation plans.

Since the 1970-71 school year, petitioner has operated an independent private school in Calhoun County for grades 1 through 12. The school also now has a kindergarten class. Because petitioner and its school are in effect the same, and there is no need to distinguish between the two, we refer to both as petitioner hereinafter.

In its first school year, 1970-71, petitioner had 235 students enrolled. During the 1985-86 and 1986-87 school years, petitioner employed approximately 30 teachers and staff and had approximately 420 students. For the 9 school years concluding with 1986-87, the size of the 12th grade graduating class ranged from 24 to 36 students.

Petitioner distributes admission application forms only upon request and specific students or types of students are not recruited. Admission is available to those students scoring at or above the 50th percentile on the Stanford Standard Achievement Test for the grade level applied for, provided that tuition and other fees will be paid in full. For the 1986-87 school year, petitioner charged tuition for nonkindergarten students of $1,200, supplemented by a building fund fee of $200 to $500, depending on the student's grade. Tuition for kindergarten students varied from $350 to $810, depending on age and selected attendance option. Tuition charges for the following school year, 1987-88, were $1,300 for nonkindergarten students, again supplemented by a building fund fee, and a maximum of $600 for kindergarten students. Because of a lack of its own funds, petitioner has never granted a scholarship or reduced tuition payments for any student.

Petitioner's students select either a general or more rigorous college preparatory program. Since the beginning of operations in 1970, nearly 80 percent of petitioner's graduates have moved on to some form of postsecondary education. Of the graduating class of 1986, 19 out of 19 students in the college preparatory program entered college and 12 out of 17 students in the general program went on to technical schools or colleges. Of the graduating class of 1985, 17 out of 18 students in the college preparatory

program entered college and 13 out of 15 students in the general program went on to technical schools or colleges. In the public schools of the Calhoun school district, within which petitioner is physically located, only 49 students out of a 1985 graduating class of 130 entered junior or senior colleges or technical education centers with degree programs.

For its fiscal year ended June 30, 1986, petitioner had a deficit in retained earnings of over $300,000. The $211,000 deficit in its unrestricted fund balance nearly tripled the deficit balance from 5 years before. From July 1, 1982, through December 31, 1985, petitioner received only one private donation, in the amount of $4,000. Potential donors have sometimes declined to make contributions upon learning that the contributions would not be deductible for Federal income or estate tax purposes.

Since opening its doors in 1970, petitioner has never had a black student enrolled. A black student has in fact never applied for admission. On two occasions, however, both during the 1984-85 school year, petitioner provided an application form to a black parent. Petitioner has also never had, or received an employment application from, a black teacher. Petitioner does not actively recruit teachers because of a lack of available funds for advertising and travel expense reimbursement. Petitioner does, however, inquire about possible applicants through student placement offices at various colleges.

Prior to 1982, petitioner had no minority students, black or otherwise, and no minority teachers. (As used herein, "minority" has its commonly understood meaning in the racial context, namely "other than Caucasian." We recognize, however, that the whites in Calhoun County, who total less than half of the population, are statistically a minority group relative to the total population of the county.) Since 1982 petitioner has had at least one "American-Oriental" student, but no representatives of other minorities. During the 1986-87 school year, petitioner had two American-Oriental students and two more were accepted for admission for the following school year. In 1983 petitioner hired its first and only minority teacher, who is of "Japanese-American" descent.

Petitioner's students sometimes engage in school-sponsored activities that directly or indirectly involve black students and adults. For example, classes sometimes travel to South Carolina State College, a predominantly black college in neighboring Orangeburg, South Carolina, to visit the planetarium or attend theatrical performances. In addition, petitioner's basketball and football teams have occasionally competed with teams, specifically East Cooper Academy and St. Angela, "having black athletes." During the 1985 season, petitioner's football team competed against these two schools and eight others prior to the playoffs. The East Cooper Academy basketball team had one black member when it played in petitioner's recent Christmas tournament.

Petitioner and its students also participate in some educational and vocational programs that directly involve blacks. Petitioner's students are eligible for federally funded testing and remedial programs offered through the public school system and, in this regard, have attended classes at Guinyard Middle School, the majority of whose students are black. Further, for several years petitioner has sponsored a program called "Operation Get-Smart," which is promoted by the South Carolina Department of Corrections. Inmates in this program, most of whom are black, visit schools to encourage students to stay in school and out of trouble. The inmates lead small discussion groups and sometimes eat with the students. Finally, members of the Armed Forces visit petitioner to recruit or to administer aptitude tests. Many of these Armed Forces representatives are black.

In addition to the occasional interaction of its students with blacks, petitioner's facilities are sometimes used for programs sponsored by the Calhoun County Arts Commission, with "a racial mix among performers."

Petitioner never publicly announced a racially nondiscriminatory policy toward students prior to November of 1985. As certified by the secretary of state of South Carolina on November 27, 1985, petitioner's charter was formally amended as follows:

RESOLVED, that The Calhoun Academy, Inc., shall admit students of any race, color, national or ethnic origin to all the rights, privileges, programs and activities generally accorded or made available to students

at the school. It shall not discriminate on the basis of race, color, national and ethnic origin in administration of its educational policies, admissions policies, scholarship and loan programs, and athletic and other school administered programs.

A few weeks earlier, petitioner had announced what was to become the substance of its charter amendment. On November 11, 1985, a "Notice of Nondiscriminatory Policy as to Students" appeared in the Times and Democrat, a newspaper published in Orangeburg, South Carolina. After a nondiscriminatory statement nearly identical to that in the charter amendment, the notice added this sentence: "The above statement of our racially nondiscriminatory policy as to students will be included in all brochures and catalogs hereafter used."

Periodic report cards issued to students contain a statement of nondiscriminatory policy, as do all application forms, student handbooks, and newspaper advertisements printed since November of 1985, though not in as much detail as the original published announcement. Except for newspaper advertisements, petitioner disseminates information only upon request. Therefore, the newspaper advertisements are the only means by which petitioner affirmatively communicates its statement of nondiscriminatory policy to the general public or to specific groups.

In the May 15, 1986, edition of the Calhoun Times, a local weekly newspaper read by all racial segments of the community, petitioner announced that it was accepting applications for the upcoming school year. A statement in relatively fine print at the bottom of the notice read: "Calhoun Academy Has A Non-Discriminatory Policy In Regard To Race, Creed, Color or National Origin."

To announce an open house for prospective students and their parents in April of 1987, petitioner published advertisements in both the Times and Democrat and the Calhoun Times. Petitioner included a statement that "Calhoun Academy admits students of any race, color and national or ethnic origin." Because of the format and brevity of the three substantially identical advertisements, and the relatively large print size of the nondiscrimination statement, a reader interested in the subject matter of the advertisements would have been unlikely to overlook the statement.

The similar statement that appears in petitioner's applications for admission and student handbooks is not so conspicuous.

Despite its limited employment and enrollment experience with minorities, petitioner has never been a party to any litigation involving a claim of racial discrimination.

The population of Calhoun County, as of July 1, 1985, was approximately 12,300, with "nonwhites" constituting about 52 percent of that number. Almost all of the nonwhites are blacks, with other groups contributing only insignificantly to the 52-percent total. During the 1985-86 school year, 303 white students and 1,724 nonwhite students, including kindergarteners, were enrolled in the public schools of the Calhoun school district, the 11th highest percentage of nonwhites among the 92 school districts in South Carolina. Private school students at this time, numbering nearly 450, were 18 percent of total students in Calhoun County. Only one of the 45 other counties in South Carolina had a higher percentage of private school students.

As of 1980, 100 percent of the population in the Calhoun school district was classified as rural, compared to the median South Carolina school district having a split of 69 percent rural, 31 percent urban. The 1979 median household income in the Calhoun school district was $12,527 and 17.3 percent of families living there in 1980 were considered to be living below the 1979 poverty level. According to petitioner—

In the economic area served by Calhoun Academy there are few professional people among minority groups. * * * Most members of minority groups are blue collar workers and the few white collar jobs are primarily in public education. The children of these professional people attend the schools in which their parents teach and administer. * * *

The Calhoun school district had operating expenditures per pupil for the 1985-86 school year of nearly $3,400, ranking fourth in the State. Operating expenditures consist of general administration, instructional services, plant operations and maintenance, and auxiliary services. The increase from the corresponding amount for the 1975-76 school year was nearly $2,500, an increase over that time period surpassed by only one school district in the State.

Teachers in the public schools of the Calhoun school district are generally paid considerably more than petitioner's teachers. As of October 1, 1986, the highest of petitioner's teacher salaries was $13,455, with an average of $11,500. The average for Calhoun school district teachers in the 1985-86 school year was $20,686.

The Calhoun school district also has a high school building, financed with $4,750,000 of school building bonds in 1982, that is much newer than petitioner's three main buildings. Petitioner constructed its current facilities several years prior to 1982 at a total cost of approximately $485,000.

On June 17, 1986, petitioner filed an application with respondent, requesting an exemption from Federal income tax as an organization described in section 501(c)(3). Petitioner's board of directors had authorized this step 2 weeks earlier in the hope that a favorable ruling, entailing tax-deductible charitable contributions for donors, would encourage contributions.

After requesting and receiving detailed information concerning petitioner's race-related policies and practices, the Internal Revenue Service (Service) national office tentatively denied petitioner's application by letter dated April 21, 1987. The letter emphasized petitioner's formation at the time of enforced desegregation in the local public schools, its total absence of black students despite a sizable local black population, and its failure to adopt and publicly announce a racially nondiscriminatory policy until 1985. According to the letter, petitioner had not overcome this cumulative inference of racial discrimination:

A private school with *a history of racial discrimination* must provide clear and convincing evidence that it no longer discriminates on the basis of race. Furthermore, such a school must provide persuasive evidence that the absence of black enrollment is not attributable to a continuation of the school's past policies. Mere adoption and publication of a policy of racial nondiscrimination is insufficient for such a school to demonstrate that it is operating in a bona fide nondiscriminatory manner in accordance with Rev. Proc. 75-50. For these reasons, although your organization adopted and published a nondiscriminatory policy, your school must provide evidence of further objective acts which overcome your history of discrimination.

*       *       *       *       *       *       *

Your organization has *not demonstrated* by sufficient objective evidence that its adoption and communication of the nondiscriminatory policy was done in *good faith.* In fact, the information suggests that adoption and publication of the nondiscriminatory policy was done solely to obtain tax exemption, *without a sincere intention* to communicate the openness of the school to all members of the community. In considering all the facts and circumstances of your organization's formation, background, and present operations, we conclude that you have provided insufficient evidence of activities which could overcome *your history of racial discrimination.* Accordingly, your organization has failed to meet its burden of establishing the existence of a bona fide nondiscriminatory policy. [Emphasis in original.]

This letter also stated that petitioner could protest the adverse ruling in writing and, if so requested in petitioner's protest letter, have a conference with respondent's representatives. Petitioner timely filed its protest by letter dated June 30, 1987. Included with the protest letter were various affidavits and other supporting documentation. The protest letter requested a conference.

At the conference, which was held on August 25, 1987, petitioner was represented by its attorney and members of its board of directors. Petitioner's representatives supplied respondent's representatives with a copy of the Calhoun Times, dated August 20, 1987, which included an article about petitioner. The article stated that petitioner "is open to students of any race, color, and national or ethnic origin." Respondent's representatives stated that petitioner had not made sufficient contacts with the black community, suggesting that petitioner could correspond directly with local black leaders regarding petitioner's nondiscriminatory policy, contact placement offices of predominantly black colleges about teaching positions, and offer reduced tuition for black students.

By letter dated November 5, 1987, one of petitioner's directors informed respondent of petitioner's rejection of the reduced tuition suggestion, stating that "such a policy represents an affirmative action requiring an unequal treatment of our students." The other two suggestions had been discussed, according to this letter, but "No final decision has been made because the chairman of the Board has been unavailable due to an extended vacation." This letter also expressed disappointment that one of respondent's represen-

tatives had informed counsel for petitioner that tax-exempt status would be denied regardless of contacts with the black community. Petitioner never informed respondent of its decisions, if any, on the two pending suggestions.

Respondent's final adverse ruling letter, dated February 26, 1988, stated in part:

you have not demonstrated conclusively that you have in good faith operated in a racially nondiscriminatory manner, as required by Rev. Proc. 75-50, 1975-2 C.B. 587.

\*    \*    \*    \*    \*    \*    \*

More than ninety days have passed since the conference [of August 25, 1987], and you have failed to submit any additional evidence demonstrating good faith racially nondiscriminatory operation. We have carefully considered your letter of November 5, 1987, and continue to conclude that our adverse ruling letter of April 21, 1987, is correct.

We would be pleased to entertain a future application when you have sufficiently changed your activities to demonstrate bona fide nondiscriminatory operation. Both the courts and the Service have noted certain types of objective actions indicative of nondiscriminatory policies in operation. Such factors include, but are not limited to, active and vigorous recruitment of minority students and teachers, financial assistance to minority students, and effective communication of the nondiscriminatory policy to the minority population, including publication and actual contact with the community. Again, additional actions must be taken by the school in order to overcome its history of discrimination.

Section 501(a) generally exempts from Federal income taxation those organizations described in section 501(c), which lists corporations "organized and operated exclusively for religious, charitable, \* \* \* or educational purposes." Sec. 501(c)(3). Contributions to such organizations are generally deductible to donors. Sec. 170(a) and (c)(2). Petitioner seeks a determination that it qualifies under section 501(c)(3) and the sole issue is whether petitioner has a racially nondiscriminatory policy as to students.

Rev. Rul. 71-447, 1971-2 C.B. 230, formalized a Service position, first announced in 1970, about the effect of private school racial discrimination policies on tax-exempt status. The revenue ruling concludes that:

a school not having a racially nondiscriminatory policy as to students is not "charitable" within the common law concepts reflected in sections 170 and 501(c)(3) of the Code and in other relevant Federal statutes and accordingly does not qualify as an organization exempt from Federal income tax. [1971-2 C.B. at 231.]

In *Bob Jones University v. United States,* 461 U.S. 574 (1983), the Supreme Court approved the Service view expressed in Rev. Rul. 71-447 and held that racially discriminatory private schools do not qualify for exemption under section 501(c)(3). Drawing upon the common law of charitable trusts for standards, the Supreme Court determined that racially discriminatory private schools violate fundamental public policy and cannot be viewed as conferring a benefit on the public. 461 U.S. at 595, 596 n. 21.

Rev. Proc. 75-50, 1975-2 C.B. 587, describes detailed guidelines and recordkeeping requirements to be used in determining whether a private school that applies for a section 501(c)(3) exemption has a racially nondiscriminatory policy. The burden placed upon applicants is broadly stated as follows:

A school must show affirmatively both that it has adopted a racially nondiscriminatory policy as to students that is made known to the general public and that since the adoption of that policy it has operated in a bona fide manner in accordance therewith. [1975-2 C.B. at 587.]

Subject to limited exceptions, Rev. Proc. 75-50 specifically requires, among other things: (1) A statement in the governing instrument of the school that it has a racially nondiscriminatory policy as to students; (2) a similar statement in school brochures, catalogs, and written advertising; (3) publicizing of the policy, through print or broadcast media, to all racial segments of the community served by the school; (4) an annual certification that the school is in conformance with relevant parts of the revenue procedure; and (5) retention of specified records for a minimum of 3 years.

Petitioner maintains that it has complied in all material respects with the requirements of Rev. Proc. 75-50. Respondent disagrees, as is apparent from the statement in his final adverse ruling letter of February 26, 1988, that "you have not demonstrated conclusively that you have in good faith operated in a racially nondiscriminatory manner, as required by Rev. Proc. 75-50, 1975-2 C.B. 587."

We need not address the degree of petitioner's compliance with Rev. Proc. 75-50. As this Court has noted, revenue procedures are merely guidelines "representing the position

of the Service and not substantive law." *Virginia Education Fund v. Commissioner,* 85 T.C. 743, 751 (1985), affd. per curiam 799 F.2d 903 (4th Cir. 1986). The revenue procedure has also been characterized as a Service litigating position that does not bear upon a substantive interpretation of the section 501(c)(3) prerequisites. *Prince Edward Sch. Foundation v. United States,* 478 F. Supp. 107, 111-112 (D.D.C. 1979), affd. without published opinion (D.C. Cir. 1980), cert. denied 450 U.S. 944 (1981).

The parties agree that the burden of proof in this proceeding rests with petitioner under Rule 217(c)(2). There appears to be some confusion, however, as to what the burden-of-proof standard is. We have previously defined the burden applicable to sections 7428 and 501(c)(3) as proof by a preponderance of the evidence. *Federation Pharmacy Services v. Commissioner,* 72 T.C. 687, 691 (1979), affd. 625 F.2d 804 (8th Cir. 1980). This contrasts with the higher "clear and convincing evidence" standard applicable, for instance, in fraud cases under section 7454(a) and Rule 142(b).

Respondent on brief disavows the applicability of a heightened standard in this case. Nonetheless, respondent's letter to petitioner of April 21, 1987, expressly states: "A private school with *a history of racial discrimination* must provide clear and convincing evidence that it no longer discriminates on the basis of race." (Emphasis in original.) This sentence standing alone speaks of an abstract private school, with no direct reference to petitioner. From the context, however, there is little doubt that the sentence is meant to apply specifically to petitioner. In this regard, we note that the next paragraph of the letter, clearly addressing petitioner, refers to *"your history of racial discrimination."* (Emphasis in original.) See also General Counsel's Memorandum 39525 (July 1, 1986) ("Private schools seeking recognition of exempt status bear the burden of affirmatively establishing bona fide operation consistent with a policy of nondiscrimination by clear and convincing evidence."); General Counsel's Memorandum 39524 (July 1, 1986); General Counsel's Memorandum 39754 (September 8, 1988).

"Clear and convincing" language has sometimes appeared in cases, of other courts, that involve private schools and racial discrimination issues. In *Norwood v. Harrison,* 382 F. Supp. 921 (N.D. Miss. 1974), the court addressed itself to private schools wanting to borrow textbooks owned by the State of Mississippi. To respect constitutional constraints, the court sought to disqualify those schools that racially discriminated. The court focused on private schools, formed or expanded at the time of public school desegregation, that had a continuing absence of black students and teachers. These private schools bore a presumption of racial discrimination that could be rebutted only by evidence that would "clearly and convincingly reveal objective acts and declarations establishing that the absence of blacks was not proximately caused by such school's policies and practices." 382 F. Supp. at 926.

The court in *Brumfield v. Dodd,* 425 F. Supp. 528 (E.D. La. 1976), considered a similar constitutional issue for private schools seeking assistance from the State of Louisiana in the form of textbooks, classroom materials, and transportation financing. The court quoted extensively from *Norwood v. Harrison, supra,* and expressly relied on the burden-of-proof analysis therein. *Brumfield v. Dodd,* 425 F. Supp. at 531-532.

Similar principles have been applied to section 501(c)(3). In *Green v. Miller,* an unreported case (D.D.C. 1980, 45 AFTR 2d 80-1566, 80-1 USTC par. 9401), the court supplemented and modified an outstanding permanent injunction relating to the tax-exempt status of Mississippi private schools. For a school bearing an inference of racial discrimination, the inference "may be overcome by evidence which clearly and convincingly reveals objective acts and declarations establishing that such is not proximately caused by such school's policies and practices." 45 AFTR 2d at 80-1567, 80-1 USTC at 84,089.

We are not compelled to reconcile the "clear and convincing" language of these cases with the standard we find applicable here, a preponderance of the evidence, because these cases arose under neither section 7428 nor Rule 217. Indeed, *Norwood v. Harrison, supra,* and *Brumfield v. Dodd, supra,* address constitutional issues that are not before us

in the instant case. Although *Green v. Miller, supra,* relates directly to section 501(c)(3), the focus of the injunction is at the administrative level, specifically the Service determination of tax-exempt status, rather than the judicial review stage.

We note further that the effects of the two formulations may be practically equivalent because of the differing points at which unfavorable inferences enter into the analysis. The "clear and convincing" standard, as described in these cases, applies on rebuttal only after an inference of racial discrimination has taken hold. The "preponderance of the evidence" standard, in contrast, begins with a clean evidentiary slate. A taxpayer faced with an unfavorable evidentiary inference at the outset plainly bears a heavier burden from that point forward, however articulated, than a taxpayer with no such unfavorable inference yet established.

Concerning what petitioner must prove, its burden in this proceeding, in broad terms, is to establish that it has a racially nondiscriminatory policy as to students. *Bob Jones University v. United States, supra.* More precisely, petitioner must show that it has adopted a racially nondiscriminatory policy as to students and operates in good faith in accordance with that policy. See *Virginia Education Fund v. Commissioner,* 85 T.C. at 748. If adoption of the policy is defined to mean adoption in substance rather than merely in form, then the adoption and operation elements are largely redundant. Adoption in form also does not reasonably stand as a separate element, instead serving most appropriately as a fact that contributes to an inference of good faith operation in a racially nondiscriminatory manner. Therefore, to have a separate and meaningful existence, the adoption element must be something more than adoption in form, yet something less than adoption in substance. Specifically, we define the adoption element to require more than mere adoption in form on the books of the organization. The adoption element requires adoption of a nondiscriminatory policy in form on the books of the organization, coupled with appropriate publicity and notification to the various relevant groups in the community so that adoption of the policy is known publicly.

Having a racially nondiscriminatory policy as to students, which bears a definition implicitly approved by the Supreme Court in *Bob Jones University v. United States, supra,* means that:

the school admits the students of any race to all the rights, privileges, programs, and activities generally accorded or made available to students at that school and that the school does not discriminate on the basis of race in administration of its educational policies, admissions policies, scholarship and loan programs, and athletic and other school-administered programs. [Rev. Rul. 71-447, 1971-2 C.B. at 230.]

With respect to the adoption of a racially nondiscriminatory policy, as we have defined it above, we find that petitioner has met its burden of proof. During November of 1985, petitioner published a "Notice of Nondiscriminatory Policy as to Students" in a local newspaper. Printed materials designed to be seen by the general public, including all application forms and newspaper advertisements since that time, make reference to the nondiscriminatory policy. In at least some of the advertisements, the nondiscriminatory policy statement is prominent enough that it would not be easily overlooked by readers. Significantly, at least one of the local newspapers that sometimes carries petitioner's advertisements, the Calhoun Times, is read by all racial segments of the community served by petitioner. Finally, the population of the surrounding community is small enough (with only 12,000 people in Calhoun County) and petitioner is large enough (having nearly 20 percent of all students within the boundaries of the Calhoun school district) that the stated nondiscriminatory policy could not be unknown to any racial group in the community.

Whether or not petitioner operates in good faith in accordance with its stated policy is a more complicated question. Respondent argues that three factors taken together establish an inference that petitioner discriminates on the basis of race. The first is that petitioner incorporated and began operations at a time when the public schools in Calhoun County were subjected to court-supervised desegregation plans. See *Whittenberg v. Greenville County School District,* 298 F. Supp. 784 (D.S.C. 1969). The formation or expansion of a private school at a time of desegregation in

nearby public schools is widely regarded by the courts as a material consideration in the racial discrimination analysis. E.g., *Virginia Education Fund v. Commissioner,* 85 T.C. at 748; *Prince Edward Sch. Foundation v. United States,* 478 F. Supp. at 112; *Brumfield v. Dodd,* 425 F. Supp. at 531; *Norwood v. Harrison,* 382 F. Supp. at 924-925; *Green v. Connally,* 330 F. Supp. 1150, 1173-1174 (D.D.C. 1971), affd. per curiam sub nom. *Coit v. Green,* 404 U.S. 997 (1971). The specific inference here is that petitioner was established to provide an alternative for white students who preferred, or whose parents preferred, a school without black students in attendance.

The second major factor that arguably contributes to an inference of racial discrimination is that, despite a local population that is approximately 50-percent black, petitioner has never had a black student enrolled. Petitioner counters that a black student has never applied and thus never been denied admission. The record accordingly lacks direct evidence for either party concerning whether petitioner discriminates against black students when considering application forms. Obviously, the record also lacks direct evidence of discrimination against black students, or lack thereof, after admission. This apparent stalemate, however, does not relieve petitioner of its burden—as a prerequisite to gaining tax-exempt status—"to establish that its policy is to admit black students on the same basis as those of other races." *Prince Edward Sch. Foundation v. United States,* 478 F. Supp. at 112.

The third factor applicable in the instant case is that petitioner did not publicize a racially nondiscriminatory policy or amend its charter until 1985, shortly before applying to respondent for tax-exempt status. One possible inference is that petitioner has never had a racially nondiscriminatory policy and began disingenuously to publicize one to acquire tax-exempt status. A second possible inference is that petitioner did not have a racially nondiscriminatory policy before 1985, but in good faith embraced one, again to acquire tax-exempt status. Petitioner contends that it has always had a policy of racial nondiscrimination and therefore rejects both of these possible inferences.

Clearly, if we were to find that petitioner publicized a nonexistent policy to attain tax-exempt status, petitioner could not prevail here. However, if we were to find that petitioner in good faith first implemented the policy in 1985 in order to become tax-exempt, this would not preclude a favorable determination for petitioner. Section 508(a) ensures that petitioner's tax-exempt status under section 501(c)(3) would not be retroactive to any period of racial discrimination. Moreover, we have acknowledged the right of an organization to show that it has mended its ways. *Virginia Education Fund v. Commissioner,* 85 T.C. at 748. See also *Prince Edward Sch. Foundation v. United States,* 478 F. Supp. at 112, 450 U.S. at 946 (Rehnquist, *J.,* dissenting from denial of cert.).

As already noted, petitioner has no direct evidence that it operates in accordance with a racially nondiscriminatory policy as to black students, at least from the application evaluation stage forward. Consequently, from petitioner's indirect evidence we must be able to draw the inference that petitioner would operate in a nondiscriminatory manner when considering the application of a black child or when administering school policies for an already enrolled black student.

Petitioner points out that it has provided to a black parent, on the only two occasions requested, an application for admission. We note, however, that the application distribution stage of the admissions process is not the time when discrimination would necessarily manifest itself. Indeed, distributing application forms on request to members of a disfavored group is a harmless, empty gesture for a discriminatory school if the school feels confident that a completed application will not be submitted. A school reaches a meaningful decision point only when faced with a submitted application. Petitioner's "by request only" distribution policy ensures a lack of widespread distribution. Because of the small number involved here, we attach little weight to petitioner's distribution of application forms to two black parents.

Petitioner places great emphasis on its teacher and students of Oriental descent, labeling this evidence "perhaps the most telling." Petitioner has hired and continued

to employ a Japanese-American teacher, who has been subjected to no discriminatory practices since his hiring. Petitioner has also admitted some American-Oriental students. Nonetheless, that petitioner does not discriminate against those of Oriental descent, which we assume to be true for present purposes, implies nothing about petitioner's policy toward blacks. Petitioner concedes that the largest nonwhite racial group in the local community is the black population. Petitioner's argument that American-Orientals are "more of a minority than blacks," while certainly true for Calhoun County, is totally without significance here. We decline to embrace the notion, grounded in an erroneous application of a fortiori logic, that acceptance of a given minority group implies acceptance of all larger minority groups.

In addition to the two application forms provided to black parents, petitioner relies on its interaction with blacks in other schools and the surrounding community to prove that it follows its stated nondiscriminatory policy.

In today's world, interaction with persons of another race in interscholastic and community activities is unavoidable by all but the most reclusive or isolated groups. Petitioner's burden is not met by showing that it interacts with outsiders. The relevant criteria deal with restrictions on those who may become insiders, i.e., students at the school.

Petitioner seeks to explain its total absence of black students on two principal grounds, economics and the quality of the local public schools.

Petitioner asserts that Calhoun County families, "both black and white," typically cannot afford petitioner's fees. Statistics in the record, without a breakdown by race, confirm that petitioner's fees would cause a financial hardship to most families, even with only one child enrolled. This does not explain, of course, how the parents of over 400 white students are able to afford petitioner's private schooling every year. Petitioner addresses this point by representing that local blacks generally are economically disadvantaged relative to whites. Petitioner admits, however, that there are some professional people among the local black population:

In the economic area served by Calhoun Academy there are *few* professional people among minority groups. \* \* \* *Most* members of minority groups are blue collar workers and the few white collar jobs are *primarily* in public education. The children of these professional people attend the schools in which their parents teach and administer. \* \* \* [Emphasis added.]

Thus, economics alone cannot explain the total absence of black applicants over a span of 17 school years, or even over the 2 school years since petitioner's announcement of a racially nondiscriminatory policy.

Petitioner's other principal justification for a lack of black students is that the quality of the local public schools is in some respects superior to that of petitioner. Statistics in the record show that the local public schools have better paid teachers and significantly higher expenditures per pupil. In addition, a new public high school was constructed recently. These would certainly be meaningful explanatory facts if petitioner's hallways and classrooms were empty. Unexplained, however, is why over 400 white students annually forgo the quality education in the public schools.

Petitioner suggests that it prepares students better for college and other postsecondary education, and states that "it is likely that at least some parents (both black and white) have not sent their children to \* \* \* [petitioner] because they knew that their children were unlikely to go on to college." This assertion is speculative and does not explain the total absence of black students at petitioner's school.

On brief, petitioner suggests another reason for its success in attracting local students:

It is likely that Petitioner's strict rules and procedures provide a better regimen for learning than in the public schools. Certainly the parents of children enrolled at Petitioner send their children there to be inculcated with the fundamental values of discipline, hard work and respect for others, in addition to learning their "ABCs." \* \* \* It is Petitioner's approach to teaching young children that permits Petitioner to continue to attract students year after year.

If meant to explain the absence of black students, this explanation exhibits the same deficiencies as petitioner's statement about its superior college preparation. This "better regimen for learning" undercuts petitioner's more

central argument about the relatively high quality of the local public schools. Further, there is nothing in the record to suggest that "strict rules and procedures" appeal more to the local white students and their parents than the local blacks.

In sum, at least some of the black parents in the local community have the financial resources to send their children to petitioner and at least some of the public school black students go on to higher education. Combining these two facts suggests that petitioner, if it truly has a racially nondiscriminatory policy, should have received some applications from black students after November of 1985.

Respondent's representatives, at the conference with petitioner's representatives on August 25, 1987, suggested that petitioner correspond directly with black community leaders about a nondiscriminatory policy, contact placement offices of black colleges about available teaching positions, and reduce tuition for some black students. By letter dated November 5, 1987, one of petitioner's board members stated that petitioner would not offer a tuition reduction plan for black students. The letter also stated that the other two suggestions had been discussed, but that a final decision on those had not yet been made. Petitioner did not inform respondent of a final decision on these two items, one way or the other, prior to respondent's final adverse ruling letter dated February 26, 1988.

In our view, a private school generally may meet its burden of proof under section 501(c)(3) without establishing that it took affirmative steps on its own initiative to attract students and teachers of underrepresented races. Rev. Rul. 71-447, 1971-2 C.B. 230, holds that a private school generally not having a racially nondiscriminatory policy as to students cannot be exempt from tax under section 501(c)(3). The definition of the key phrase, "racially nondiscriminatory policy as to students," is as follows:

the school admits the students of any race to all the rights, privileges, programs, and activities *generally accorded or made available* to students at that school and * * * the school *does not discriminate* on the basis of race in administration of its educational policies, admissions policies, scholarship and loan programs, and athletic and other school-administered programs. [1971-2 C.B. at 230. Emphasis added.]

This definition on its face forbids negative racial practices rather than demands positive ones. Standing alone, therefore, this definition cannot reasonably be read to require the activities suggested by respondent's representatives.

The Supreme Court has expressed its approval of the rationale in Rev. Rul. 71-447 without attempting to extend it. *Bob Jones University v. United States,* 461 U.S. at 595, 601-602. Granted, the facts before the Supreme Court did not raise an affirmative action issue because both subject schools discriminated within the Rev. Rul. 71-447 definition. 461 U.S. at 605. The Supreme Court emphasized, however, that an institution should be deemed not charitable under its analysis only when there can be "no doubt" that the activity involved is contrary to a fundamental public policy. 461 U.S. at 592, 598. Declining to take affirmative steps to seek out black students and teachers does not fall within this standard. See Farber, "Statutory Interpretation, Legislative Inaction, and Civil Rights," 87 Mich. L. Rev. 2, 17 (1988):

> There is much dispute in our society about how the norm of racial equality should be applied in connection with issues such as affirmative action. But the core equality norm—that intentional discrimination against racial minorities is impermissible—is surely not in dispute. [Fn. refs. omitted].

A conclusion that a private school generally is not required to take the specific affirmative acts suggested by respondent, however, does not equate with a conclusion that petitioner on the record in the instant case has satisfied its burden of proving that its operations qualify for tax-exempt status. Petitioner's evidence, in summary, is that it adopted a formal statement of nondiscrimination and did not insulate itself from interaction with black outsiders. This evidence is insufficient to preponderate in favor of a finding that it operated in a racially nondiscriminatory manner. The absence of either a single black student in the school or a plausible explanation of inability to attract black students permits an inference of discrimination, particularly in view of petitioner's history. In order to prevail, petitioner must have done something to overcome the unfavorable inferences that may be drawn from the record in the instant case. Petitioner's taking of affirmative steps of some sort

(not necessarily those suggested by respondent's representatives) might have been appropriate to overcome the effect of the evidence in the record that is unfavorable to this petitioner.

From the record before us, it appears that white students and their parents gravitate to petitioner at least in part because of a historical absence of black students: petitioner admits that the local public schools are superior in material respects, yet considerably less expensive. Petitioner's survival would thus depend to some extent on perpetuating its history. Overt racial discrimination, however, would clearly preclude section 501(c)(3) tax-exempt status and the corresponding financial benefits. *Bob Jones University v. United States, supra.* See also *Runyon v. McCrary,* 427 U.S. 160 (1976). A private school with similar pressures could attempt to satisfy everyone by having an abstract nondiscriminatory policy, but with no significant efforts to attract blacks. If local blacks show little interest in attending the school, an intermediate result of the school's strategy would be little or no evidence of the policy in action. The ultimate result in this type of proceeding, and the danger for a school steering this balancing course, could very well be that the school fails in its burden of proof.

After a comprehensive review of the administrative record, we find that petitioner has not carried its burden to show that it operates in good faith in accordance with a racially nondiscriminatory policy as to students. In other words, we cannot conclude that nondiscrimination in petitioner's operations is more likely than discrimination, and thus the preponderance of the evidence standard has not been satisfied. Accordingly, petitioner has not shown that respondent was erroneous in denying petitioner tax-exempt status under section 501(c)(3).

*Decision will be entered for the respondent.*